Per Curiam :
This case was referred to Trial Commissioner Mastín G. White with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on December 18, 1964. Exceptions and briefs were filed .by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth.* Plaintiff is therefore entitled to recover under the first count of the petition, as amended, and judgment is entered to that effect with the amount of recovery to be determined pursuant to Bule 47 (o) (2). Count II of the petition, as amended, and the defendant’s counterclaims are dismissed.
Commissioner White’s opinion,** as modified by the court, is as follows:

Switching Charges

This case involves (among other things) the validity of charges which The Alaska Railroad made in 1956 under its Tariff 3-A against the plaintiff for switching a number of *346 railroad, cars loaded with, scrap to a track oil a railroad-operated dock in Seward, Alaska, so that the scrap could be loaded aboard ships chartered by the plaintiff.
The Alaska Eailroad (which, for the sake of convenience, will usually be referred to hereafter in the opinion as “the Eailroad”) is a Government agency that operates a railroad from Fairbanks, in the interior of Alaska, to the port cities of Anchorage, on Cook Inlet, and Seward, on Eesurrection Bay, Gulf of Alaska. The Eailroad is under the jurisdiction and control of the Secretary of the Interior, and is part of the Department of the Interior.
The scrap involved in the switching charges was purchased by the plaintiff from the Eailroad; and the plaintiff contends that the switching of the scrap-loaded cars to the Eailroad’s dock in Seward constituted a service which the Eailroad was obligated to perform under the sales contract between the parties. The defendant, on the other hand, contends that the switching of the scrap-loaded cars to the dock in Seward was a transportation service which it performed outside the scope of the sales contract, and that it was entitled to compensation for such service under its Tariff 3-A. In order to adjudicate this controversy, it is necessary to outline in considerable detail the circumstances involved in the making of the sales contract between the parties, and the delivery of the scrap under the contract.
On July 30, 1956, the Eailroad issued invitation No. 56-11 for 'bids on the “purchase and removal of Government-owned property” that .was described in the invitation as consisting of approximately 1,300 net tons of scrap steel rails with angle bars (item No. 1), approximately 1,500 net tons of other scrap steel rails (item No. 2), and approximately 8,000 net tons of miscellaneous iron and steel scrap (item No. 3). The invitation for bids contained a number of provisions that were designated as “Special Sale Terms and Conditions,” and the first of these was especially significant from the standpoint of the controversy over the switching charges. Special condition 1 was phrased in the following language:
1. Scrap is located in The Alaska Eailroad Birch-wood Yards. To be sold F.O.B. Cars, The Alaska *347 Railroad, Anchorage or Seward, Alaska. All subject to export in compliance with existing Federal regulations.
The plaintiff, which is one of the three largest scrap-metal dealers in the world, with its principal place of 'business in Dallas, Texas, learned of the prospective sale of scrap mentioned in the preceding paragraph. The plaintiff was interested in the possibility of purchasing the scrap for export to Mexico and Japan. Consequently, the plaintiff asked the Pacifio Iron & Metal Co., of Seattle, Washington, with which the plaintiff had previously dealt, to send an agent to Alaska for the purpose of inspecting the scrap, obtaining complete information regarding the prospective sale, and inquiring about arrangements for the exportation of the scrap. As a result of this request, Pacific Iron & Metal Co. sent one of its buyers, David Levinson, to Alaska. Mr. Levinson spent the period August 7-10, 1956, in Alaska on the assignment.
After receiving information from David Levinson, the plaintiff submitted a bid on August 21,1956, in response to the invitation previously mentioned. The plaintiff’s bid offered a unit price of $46.75 per ton on item No. 1, a unit price of $46.75 per ton on item No. 2, and a unit price of $38.35 per ton on item No. 3, or a total bid price of $437,700. Three days later, the plaintiff by means of a telegram raised its unit price bid on item No. 3 to $39.76 per ton, and thus raised its total bid to $448,980.
The bids submitted pursuant to the invitation previously mentioned were opened on August 24,1956, and it developed that the plaintiff was the high bidder with a total bid of $448,980. On August 27, 1956, the plaintiff’s bid was accepted, and the plaintiff was notified by means of a telegram regarding the award of the contract to the plaintiff. The plaintiff paid the full amount of the purchase price to the Railroad.[1]
At the time when the contract was entered into by the parties, it was the intention of the plaintiff to take delivery of the scrap in Seward, because the plaintiff knew that Seward is an all-weather port and the exportation of the *348 scrap would not be impeded by ice during the winter months, and the plaintiff was aware that the Railroad operates a dock in Seward.
The plaintiff elected under special condition 1 of the contract to take delivery of the scrap in Seward; and it, in effect, directed the Railroad to place the scrap-loaded cars on the dock operated by the Railroad in 'Seward, so that the scrap could be loaded for export aboard ships chartered by the plaintiff.
While the ship-loading operations were in progress, the Railroad billed the plaintiff for (among other things) switching charges under the Railroad’s Tariff 3-A in connection with the switching of scrap-loaded cars onto the Railroad’s dock in Seward. Such charges, in the total amount of $4,541.22, were covered in whole or in part by a $65,000 payment which the plaintiff made under protest in connection with a number of disputed charges aggregating $81,938.47. The plaintiff is seeking to recover the $65,000 in the present action, and the defendant is counterclaiming for the difference of $16,938.47 between the $65,000 and the $81,938.47. All the disputed charges will be discussed in the various parts of this opinion.
As we have previously noted, the sales contract between the plaintiff and the Railroad provided in special condition 1 that the scrap was “sold F.O.B. Cars, The Alaska Railroad, * * * Seward, Alaska.” The abbreviation “f.o.b.” means “free on board.” Stalik v. United States, 247 F. 2d 136, 138 (10th Cir., 1957). Therefore, the provision quoted from special condition 1 of the sales contract was a plain commitment by the Railroad, as the seller of the scrap, to deliver it on board cars, without charge, anywhere in Seward that the plaintiff might designate as the desired place of delivery, although there was necessarily an implied limitation (since the Railroad is a carrier by rail) that the plaintiff must select as the point of delivery in Seward some place where the Railroad had trackage that was appropriate for effecting delivery. The Railroad’s dock in Seward is located geographically within the limits of the Railroad’s Seward Yard (which is conterminous with the Railroad’s switching district in Seward), the dock is part of the yard for operating *349 purposes, and the trackage on the dock is obviously a suitable place for effecting the delivery of material destined for export. Consequently, when the plaintiff elected to take delivery of the scrap on the Eailroad’s dock in Seward, it was exercising a right granted by the plain language of the sales contract between the parties to the effect that the scrap was “sold F.O.B. Cars, The Alaska Eailroad, * * * Seward, Alaska.”
The defendant, however, introduced at the trial evidence indicating that the Eailroad’s dock in Seward has been treated by the Eailroad historically as though it were outside the Seward Yard for tariff purposes. At the time involved in this litigation, the Eailroad’s Tariff 3-A governed the matter of charges for switching in Seward. It provided (among other things) for the division of the Seward Yard into Zones 1 and 2; and it prescribed an intrazone switching charge of $16.15 and an interzone switching charge of $21.72. Although the Eailroad’s dock in Seward is located geographically in Zone 1 of the Seward Yard, the Eailroad has historically treated the dock as being outside the yard for tariff purposes. However, the Eailroad’s historical practice — which has not been incorporated in any written pronouncement for the information of the public — could not modify the plain language of the sales contract between the plaintiff and the Eailroad, under which the plaintiff had the option of taking delivery of the scrap anywhere within the limits of the Seward Yard, including the dock. See Crooks Terminal Warehouses, Inc. v. United States, 92 Ct. Cl. 401, 416 (1941).
Another contention made by the defendant is that David Levinson was advised prior to the making of the sales contract that the Eailroad’s Tariff 3-A would be applicable to the switching of scrap-loaded cars onto the Eailroad’s dock in Seward. The defendant introduced testimony to the effect that, before the opening of the bids, Mr. Levinson approached the Eailroad’s contracting officer for scrap sales and inquired about the Eailroad’s charges that would be applicable to the exportation of the scrap, and the contracting officer referred Mr. Levinson to the Eailroad’s Traffic Department. In the Traffic Department, according to the defendant’s testi *350 mony, Mr. Levinson conferred with. Edward R. Sanders, Assistant General Traffic Manager of the Railroad, who informed him (among other things) that the Railroad’s Tariff 3-A would be applicable to the switching of cars onto the Railroad’s dock in Seward. Mr. Sanders testified that this conversation with Mr. Levinson took place 2 days before the opening of the bids, or on August 22, 1956.
Mr. Levinson was dead when the trial was held, and his version of the time and nature of the conversation with Mr. Sanders was unavailable.
Actually, it is clear from certain objective evidence in the record that Mr. Levinson was not in Alaska on August 22, 1956; and the plaintiff relies on certain circumstantial evidence as indicating that the conversation between Messrs. Sanders and Levinson occurred while Mr. Levinson was in Alaska for a 10-day period beginning September 10,1956, or after the making of the sales contract.
However, I have found on the 'basis of all the evidence that the conversation between Messrs. Sanders and Levinson took place sometime during the period August 7-10, 1956, while Mr. Levinson was in Alaska prior to the making of the contract. Mr. Levinson did not report the conversation to the plaintiff.
Mr. Sanders was a member of the Railroad’s Traffic Department. He had not been involved in the preparation of the invitation for bids relating to the sale of scrap, and he had no responsibility in connection with the making of the sales contract. It is inferred from the evidence as a whole that Mr. Sanders, at the time of 'his conversation with Mr. Levinson, was not purporting to interpret the language of the invitation for bids, including special condition 1. Indeed, the evidence fails to show that Mr. Sanders had the invitation for bids before him at the time of the conversation with Mr. Levinson, or that he was even aware of the inclusion of special condition 1 in the invitation for bids. Mr. Sanders was concerned with tariffs and their applicability to the transportation of goods for hire; and it appears that he was furnishing to Mr. Levinson general information regarding the Railroad’s tariffs. Consequently, it would be inappropriate to regard Mr. Sanders’ statement to Mr. Lev- *351 inson as an. interpretation by the former, for tire latter’s information, of the invitation for 'bids, including special condition 1.
Moreover, the invitation for 'bids contained a general condition which specifically provided that:
Any oral statement by any representative of the Government, modifying or changing any conditions of this contract, is an expression of opinion only and confers no right upon the Purchaser.
This provision was a plain warning to all concerned that the rights and obligations of the parties under the proposed contract would be governed by the Written language of the contract, rather than by any oral negotiations that might precede the making of the contract. In view of this, the defendant is not in a good position to rely on any oral statement by Mr. 'Sanders to Mr. Levinson prior to the making of the contract as varying the plain language of the contract that the scrap was “sold F.O.B. Cars, The Alaska Railroad, * * * Seward, Alaska.”
Furthermore, the invitation for bids announced that the scrap was “subject to export”; the plaintiff purchased it for export; and, as indicated in the succeeding paragraphs of this opinion, the procedure followed by the parties in effecting delivery of the scrap from the Railroad to the plaintiff was consistent only with the theory that such delivery was being accomplished on the Railroad’s dock in Seward.
The scrap was prepared by the Railroad at its Birchwood Yard, a station north of Anchorage, Alaska, and was loaded by the Railroad’s employees into the Railroad’s cars at that point. The oars containing the scrap were then moved from Birchwood to Anchorage, where the scrap aboard the cars was weighed. The cars were then placed on sidings in the Anchorage area until they could be moved by the Railroad to Seward.
The movement of the cars containing the scrap from the Anchorage area to Seward was controlled by the Railroad, and the determining factors were the availability of space in, and the capacity of the engines pulling, the regular trains that moved between Anchorage and Seward. The cars containing scrap were generally added to the end of the regular *352 trains. The scrap moved from Anchorage to Seward under company waybills, the Railroad’s dock agent in Seward being named as the consignee. No bills of lading were prepared to govern the movement of the scrap by the Railroad.
When the cars loaded with scrap reached Seward and the trains to which they were attached were broken up, the cars containing scrap were switched 'by the Railroad to any tracks within the Seward Yard that had available space where the cars could be temporarily stored pending the unloading operations at shipside.
The plaintiff made arrangements with the Northern Steve-doring & Handling Corporation for the latter to load the scrap aboard ships chartered by the plaintiff. Also, the plaintiff made arrangements with the Railroad for berthing the chartered vessels at the dock in Seward operated by the Railroad.
No notice of the arrival of scrap-loaded cars in Seward was given by the Railroad to the plaintiff or to the Northern Stevedoring & Handling Corporation. However, a representative of the plaintiff or (when the plaintiff had no representative at Seward) a representative of the Northern Stevedoring & Handling 'Corporation, by going regularly into the Seward Yard and conferring with the Railroad’s personnel, kept currently informed regarding the availability of scrap-loaded cars that could be moved to the dock for the ship-loading operations.
A representative of the plaintiff or a representative of the Northern Stevedoring & Handling Corporation determined the sequence in Which cars loaded with scrap and temporarily stored on tracks in the Seward Yard were to be moved to the dock for the ship-loading operations. Instructions for the movement of cars to the dock were given informally to a representative of the Railroad, whereupon the Railroad switched the appropriate cars from the tracks on which they had been temporarily stored to the track on the Railroad’s dock. Upon reaching the dock, the cars were uncoupled from the switch engine. Thereafter, personnel and equipment of the Northern Stevedoring & Handling Corporation were used to position the cars near the appropriate hatches *353 and to lift the scrap from the cars into the ship’s hold. When cars were empty, they were switched from the dock by the Eailroad.
This whole procedure was consistent with the theory that, under the sales contract between the parties, delivery of the scrap was being made by the Eailroad and accepted by the plaintiff on the dock; and the procedure was inconsistent with the theory that delivery was effected elsewhere in the Seward Yard and the plaintiff then hired the Eailroad under the latter’s Tariff 3-A to switch the cars to the dock.
For the reasons previously outlined in this part of the opinion, I believe that the Eailroad breached contract 56-11, and particularly special condition 1 of the contract, when it required the plaintiff to pay for the switching of cars onto the Eailroad’s dock in Seward. On that basis, the plaintiff is entitled to recover the amount which it was improperly required to pay the Eailroad as switching charges.
I am not unmindful that the Interior Department’s Board of Contract Appeals reached a different conclusion from that stated in the preceding paragraph. In considering a claim by the plaintiff for administrative relief from the switching charges (as well as other charges to be discussed subsequently in this opinion), the Board held that the Eailroad was not obligated under special condition 1 of the contract to place scrap-loaded cars on the Eailroad’s dock in Seward at the plaintiff’s request, and, therefore, that the Eailroad was entitled to assess switching charges under its Tariff 3-A in connection with the movement of scrap-loaded cars from points elsewhere in the Seward Yard to the dock.
The interpretation of a contractual provision is a matter of law. John McShain, Inc. v. United States, 97 Ct. Cl. 281, 295 (1942) ; Gerhardt F. Meyne Co. v. United States, 110 Ct. Cl. 527, 548, 76 F. Supp. 811, 814 (1948). Therefore, the conclusion reached by the Interior Department’s Board of Contract Appeals on the legal question now under consideration is denied finality by Section 2 of the so-called Wunderlich Act (41 U.S.C. § 322 (1958)), which states that:
No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.
*354 It might be mentioned, in this connection, that there is no need to consider whether the factual issues underlying the legal question discussed in this part of the opinion are within or outside the scope of the standard “disputes” provision contained in contract 56-11, Section 1 of the Wunderlich Act (41 U.S.C. §321 (1958)), and the Supreme Court’s decision in United States v. Bianchi & Co., 373 U.S. 709 (1963). The findings of fact in this report are not in conflict with the factual determinations made by the Interior Department’s Board of Contract Appeals in disposing administratively of the plaintiff’s claim, although I have reached different conclusions on certain legal questions.

Wharfage Charges

In connection with the exportation of the scrap under contract 56-11, the Eailroad assessed against the plaintiff wharf-age charges totaling $21,841.34 under the Eailroad’s Tariff 37-D. These charges are also involved in the present litigation.
Tariff 37-D was issued by the Eailroad as the operator of a public dock facility. The tariff prescribed charges for “Handling, Loading, Unloading and Wharfage * * * on All Freight Handled Over Docks or Wharfs * * * at Seward, Alaska.”
The item (No. 35) in the tariff relative to wharfage was explained in the tariff as follows:
(a) Wharfage is the charge that is assessed on all freight passing or conveyed over, onto, or under wharves or between vessels or overside vessels when berthed at wharf. Wharfage is the charge for use of wharf and does not include charges for any other service.
The wharfage rate in Tariff 37-D for iron and steel scrap was $2 per ton, except that a lower rate of $1.50 per ton was prescribed for scrap handled by magnet from open cars.
In passing on the propriety of the wharfage charges, we must hear in mind that, as stated in the first part of this opinion, the plaintiff had the right to designate the Eail-road’s dock in Seward as the place within the Seward Yard where it would take delivery of the scrap under special condition 1 of contract 56-11. However, with respect to the *355 matter of wharfage, consideration must be given to another provision of the contract that was not pertinent in disposing of the issue of the switching charges. I refer to special condition 2, which stated as follows:
2. Berthing of ship, wharfage and handling at dockside to be arranged for by purchaser.
There is a conflict between the portion of special condition 1 which granted the plaintiff the right to take delivery of the scrap at any point within the Seward Yard, including the dock, and the portion of special condition 2 which stated that “wharfage * * * [must] be arranged for 'by purchaser” in connection with any exportation of the scrap. When the invitation for bids was originally drafted, there was not necessarily any inconsistency between special conditions 1 and 2, since it was not known then whether the successful 'bidder would export the scrap or, if the scrap should be exported, whether the purchaser would elect to take delivery in Seward or Anchorage. The Railroad had no dock in Anchorage, and it obviously would have been necessary for the purchaser to arrange for wharfage there if the scrap had been exported through Anchorage. The inconsistency arose when the plaintiff, as the successful bidder, purchased the scrap for export, elected to take delivery in Seward, and designated the Railroad’s dock there as the place of delivery under special condition 1 of the contract. In relation to the situation that was thus created, there was an ambiguity in the contract as to whether special condition 1 or special condition 2 Should prevail with respect to the right of the plaintiff to designate the dock as the place of delivery without being subjected to wharfage charges for the use of the dock as the delivery site.
In such a situation, the governing rule is that an ambiguity in a contractual provision drafted by one of the parties Should be resolved against the drafter of the instrument. Sheridan-Kirk Contract Co. v. United States, 52 Ct. Cl. 407, 413 (1917) ; Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. 390, 418 (1947) ; Breese Burners, Inc. v. United States, 128 Ct. Cl. 649, 659, 121 F. Supp. 530, 536 (1954). On that basis, the determination of the present question 'as to whether the plaintiff was entitled to have the scrap-loaded *356 oars placed on the Railroad’s dock in Seward for the purpose of taking delivery of the scrap there under special condition 1 of the contract, without 'being subjected to wharfage charges under special condition 2 of the contract, should be resolved in favor of the plaintiff.

Unloading Charges

The court is also called upon to deal in the present case with the propriety of charges aggregating $39,830.27 which the Railroad imposed on the plaintiff in connection with the unloading of cars at shipside in Seward. These charges were also imposed under the Railroad’s Tariff 37-D.
Item No. 45 of Tariff 37-D related to “Loading and Unloading,” and the tariff contained the following explanation concerning this item:
Loading and unloading charges are the respective charges for the services performed in loading freight from wharf premises on or into railroad cars, or unloading freight from railroad cars, onto wharf premises. The services include ordinary sorting, breaking down, and stacking on wharf.
The rate prescribed in Tariff 37-D for loading or unloading iron and steel scrap was $3.80 per ton, except that the rate was $2.25 per ton in connection with the loading or unloading of suCh scrap handled by magnet from open cars.
It will be noted that the portion of item No. 45 of Tariff 37-D relative to unloading prescribed “charges for the services performed in * * * unloading freight from railroad cars, onto wharf premises.” The facts in this case show that the scrap was not unloaded from the railroad cars “onto wharf premises.” Instead, the scrap was transferred directly from the railroad cars into the holds of the ships chartered by the plaintiff. The transfer was effected by means of a sling or an electromagnet attached to the ship’s tackle, which lifted the scrap out of the cars and placed it in the holds of the ships. Therefore, item No. 45 of Tariff 37-D was, by its terms, inapplicable to the unloading operation that was involved in the present case.
*357 On the other band, item No. 60 of Tariff 37-© provided that “freight handled direct between open cars spotted at ship’s side and vessel shall be subject to wharfage and loading and unloading charges, but no handling charge will be assessed.” Insofar as unloading charges were concerned, this item applied to this case because the scrap, as noted above, was transferred directly from the cars “spotted at ship’s side” to the vessel. Plaintiff was therefore liable for the unloading charges mentioned above ($3.80 per ton, except for scrap handled by magnet, for which the charge was $2.25 per ton).
It appears that after the scrap-loaded cars were switched by the Railroad onto the dock in Seward and were uncoupled from the switch engine, all subsequent operations in connection with the unloading of the cars and the loading of the ships were controlled by the Northern Stevedoring & Handling Corporation. The first step was for a rubber-tracked vehicle known as a “clee track” to shunt each car to its proper place near the appropriate hatch of the ship that was in the process of being loaded. The “clee track” was operated by a longshoreman employed by the Northern Stevedoring & Handling Corporation.
If a car was loaded with scrap that was of sufficient size to be lifted from the car into the ship’s hold by means of a sling hooked to the ship’s tackle, two longshoremen employed by the Northern Stevedoring & Handling Corporation prepared a sling-load of the scrap for attachment of the ship’s hook. Two stevedores, also employed by the Northern Steve-doring & Handling Corporation, then attached the hook to the material, and it was lifted by the ship’s tackle from the car into the hold. There, the load was unhooked and stowed by other stevedores employed by the Northern Stevedoring & Handling Corporation. This process was repeated until the car was emptied.
If a car was loaded with smaller scrap that could not be handled by means of a sling, an electromagnet attached to the ship’s tackle was used to lift the scrap from the car into the ship’s hold. The electromagnet was operated by two stevedores. When the electromagnet had removed most of the scrap and only a small amount was scattered about in the car, the remainder was assembled by two longshoremen *358 in such a way that it could be effectively removed by the electromagnet.
The Northern Stevedoring & Handling Corporation billed the Railroad, as the consignee of the scrap at the end of the rail movement, for the services of the longshoremen mentioned in this part of the opinion, on the basis that such services related to the unloading of the cars. The Railroad, in turn, billed the plaintiff under item No. 45 of Tariff 87-1). The amount paid by the Railroad to the Northern Stevedor-ing & Handling Corporation pursuant to this procedure, and the relationship of that amount to the $39,880.27 which the Railroad assessed against the plaintiff under item No. 45 of Tariff 37-D, are not shown by the evidence.
The Northern Stevedoring & Handling Corporation billed the plaintiff, as the charterer of the vessels, for the services of the stevedores previously mentioned, on the basis that such services related to the loading of the ships.
If the plaintiff believes, as indicated in the evidence, that the large sum of money which it paid the Northern Steve-doring & Handling Corporation was intended to cover both the unloading of the cars and the loading of the ships, this is a matter between two private corporations, and the court has no jurisdiction over it.

Service Charges

Another controversy involved in the present litigation relates to the propriety of service charges totaling $11,814.02 which the Railroad assessed against the plaintiff under Tariff 37-D. This charge was based upon a rate of 85 cents per ton on outbound freight under an item (No. 135) that was explained in the tariff as follows:
Service Charge is the charge assessed against ocean vessels, their owners, agents or operators, which load or discharge cargo at the terminals, for performing one or more of the following services: * * *
1. Check cargo.
2. Receive cargo from shippers or connecting lines and give receipts therefor.
3. Deliver cargo to consignees or connecting lines and take receipts therefor.
4. Prepare dock manifests, loading lists, or tags covering cargo loaded aboard vessels.
*359 5. Prepare over, short, and damage reports.
6. Order cars as requested or required by vessels.
7. Give information to shippers and consignees regarding cargo, sailing and arrival dates of vessels, etc.
* * * * *
The evidence shows that the Railroad, as the operator of the dock in Seward, performed “one or more” of the services outlined above in connection with the ships which the plaintiff chartered for the exportation of the scrap that is involved in the present case. For example, the Railroad prepared ships’ manifests and kept daily progress reports on the carloads of scrap loaded through the respective hatches, reports of cars brought on the dock, and summaries of the cars unloaded.
It appears, therefore, that the Railroad properly billed the plaintiff for service charges in the total amount of $11,-814.02 under item No. 135 of Tariff 37-D.

Charges for Equipment Rental amd Extra Labor

In its petition, the plaintiff attacked the validity of charges aggregating $3,911.62 which the Railroad assessed against the plaintiff for equipment rental and extra labor.
The plaintiff now concedes, however, that these charges were properly assessed.

Quantity of Scrap Delivered

The plaintiff’s second amendment to the petition added a count II, alleging that the quantity of scrap actually delivered to the plaintiff by the Railroad under contract 56-11 was 545.86 tons less than the quantity for which the plaintiff paid pursuant to the Railroad’s billings and, therefore, that the plaintiff was overcharged for scrap to the extent of $24,307.41. Recovery of this amount was requested in count II.
The defendant, on the other hand, asserted a second counterclaim against the plaintiff on the basis of allegations to the effect that the Railroad delivered to the plaintiff 166.6 tons of scrap over and above the amount for which the Railroad billed the plaintiff under contract 56-11. Accordingly, *360 the defendant sought to recover $6,624.02 on the second counterclaim.
The claim and counterclaim referred to in this part of the opinion have been settled by the parties. Under a stipulation that was filed oñ June 3,1964, count II of the petition, as amended, and the defendant’s second counterclaim are to be dismissed.

Summary

It is concluded that the Eailroad breached contract 56-11 by improperly assessing and collecting charges for switching and wharfage against the plaintiff, but that the Eailroad was entitled to assess and collect charges for unloading, service, equipment rental, and extra labor.
The evidence indicates that the $65,000 which the Eailroad collected from the plaintiff probably included an overcharge. The amount will be determined under Eule 47(c) (2).
FINDINGS of Fact
1. (a) The plaintiff, Commercial Metals Company, is a corporation organized under the laws of the State of Delaware. It maintains its principal place of business in Dallas, Texas.
(b) The plaintiff is one of the three largest scrap-metal dealers in the world.
2. (a) The Alaska Eailroad (which will usually be referred to hereafter in the findings as “the Eailroad”) is an agency of the defendant that operates a railroad from Fairbanks, in the interior of Alaska, to the port cities of Anchorage, on Cook Inlet, and Seward, on Eesurrection Bay, Gulf of Alaska.
(b) The Eailroad is under the jurisdiction and control of the Secretary of the Interior, and is part of the Department of the Interior.
(c) The Interstate Commerce Commission does not exercise any jurisdiction over the Eailroad, and there is no legal requirement that the Eailroad’s tariffs be filed with the ICC. However, the Eailroad voluntarily files its tariffs with the ICC for the information of the public.
*361 3. (a) On July 30,1956, the Eailroad issued invitation No. 56-11 for bids on the “purchase and removal of Government-owned property” that was described as follows:
[[Image here]]
(b) The invitation for bids further stated that:
The property described herein may be inspected between the hours of 8: 00 a.m. and 4: 00 p.m. on Monday through Friday until 4:00 p.m. August 23, 1956, by contacting J. W. Miles, Property Management Officer, The Alaska Eailroad, Anchorage, Alaska — Telephone 112-631
(c) The invitation for bids contained a number of provisions which were designated as “General Sale Terms and Conditions” and which provided in part as follows:
1. INSPECTION. — Bidders are invited and urged to inspect the property to be sold prior to submitting bids. Property will be available for inspection at the places and times specified in the Invitation. The Government will not be obliged to furnish any 'labor for such purpose. In no case will failure to inspect constitute grounds for a claim or for the withdrawal of a bid after opening.
2. Condition op Property. — All property listed herein is offered for sale “as is” and “where is,” and without recourse against the Government. If it is provided herein that the Government shall load, then “where is” means f. o. b. conveyance at the point specified in the Invitation. The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample.
*362 4. Bid Guarantee. — The bidder agrees that (1) the 'bid will not be withdrawn within the time specified for acceptance after the opening of bids (60 calendar days if no period be specified by the bidder), and will during that time remain firm and irrevocable, and that (2) the bidder will pay to the Government the purchase price of the property in accordance with the 'bid if accepted. If a bid deposit is required, the bid must be accompanied by said bid deposit. In the event of any default by the bidder or any failure by the bidder to comply with all terms and conditions of this contract, any deposit made by the bidder may be applied by the Government to any loss, cost, and expense occasioned to the Government thereby, including any loss, cost, and expense incurred in selling the property and including any difference between the amount specified in the bid and the amount for which the Government may sell the property, if the latter amount be less than the former. Deposits accompanying bids which are not accepted will be returned. Deposits of successful bidders may be applied against the contract price, and upon completion of the contract, any excess of the deposit will be returned to the bidder.
5. PaymeNT. — Payment of the balance of the purchase price, if a deposit has been made, or otherwise of the full purchase price, shall be made by cash, or by certified check, cashier’s check, bank draft, postal or express money order, payable to the Treasurer of the United States. Unless otherwise specified by the Government, payment of the full purchase price, subject to any adjustment for variation in quantity or weight pursuant to Condition No. 8, must be made prior to the date specified for removal and prior to delivery of any property. If any such adjustment is necessary, then payment must be completed, unless otherwise specified by the Government, immediately subsequent to adjustment. If the successful bidder fails to make full and final payment as herein provided, the Government reserves the right, upon written notice to the successful bidder, to sell or otherwise dispose of any or all of such property in the Government’s possession and to charge the loss, if any, to the account of the defaulting bidder. The original Purchaser will in no way 'be released from full compliance with the terms and conditions of the sale by his resale of the property.
6. Title. — Title to the items of property sold hereunder shall vest in the Purchaser as and when full and 'final payment is made, unless otherwise specified by the *363 Government, and except that if the contract provides that loading will be performed 'by the Government, title shall not vest until such loading and such payment are completed.* * *
7. DeliveRY AND Bemoval oe Property.' — The Purchaser shall be entitled to obtain the property upon vesting of title of the property in him, unless otherwise specified in the Invitation to Bid. Delivery shall be at the designated location, and the Purchaser shall remove the property at his expense. The Purchaser shall reimburse the Government for any damage to Government property caused by the removal operations of the Purchaser. If the Purchaser fails to remove the property within the specified time, the Government shall have the right to charge the Purchaser and collect upon demand a reasonable storage charge if the property is stored on premises owned or controlled by the Government, or store the property elsewhere for the Purchaser’s account, and all costs incident to such storing, including handling and moving charges, shall be borne and paid by the Purchaser; in addition to the foregoing rights, the Government may, after the expiration of thirty (30) days after the date specified for removal, and upon ten (10) days’ written notice (calculated 'from the date of mailing) to the Purchaser (which ten (10) days’ written notice may, at the option of the contracting officer, be included either partly or wholly in the thirty (30) days specified above or may be in addition thereto), resell the property, applying the proceeds therefrom against the storage and any other costs incurred for Purchaser’s account. Any details regarding removal of the property as may not be provided for herein, shall be arranged with the contracting officer, which arrangement shall be reduced to writing.
8. ADJUSTMENT EOR VARIATION IN QUANTITY OR Weight. — Any variation between the quantity or weight listed for any item and -the quantity or weight of such item tendered or delivered to the Purchaser will be adjusted on the basis of the unit price quoted for such item; but no adjustment for such variation will be made where an award is made on a “price for the lot” basis.
9. Weighing. — Where weighing is necessary to determine price hereunder, the Purchaser, unless otherwise provided, shall arrange for, and pay all expenses of weighing material, including all switching charges incurred. In case of removal by truck, weighing shall be under the supervision of the Government and, at its option, on (a) Government scales, or (b) certified scales *364 in tbe vicinity of tbe location of tbe property, or (c) certified scales in tbe vicinity of tbe Purchaser’s establishment, or (d) other scales acceptable to both parties. When removal is by rail, weighing shall be on railroad track scales, or by other means acceptable to the railroad for freight charge purposes. Government-approved weighingshall govern payment.
10. Risk op Loss. — (1) After mailing notice of award, and prior to passage of title to the Purchaser, the Government will be responsible for the care and protection of the property and any loss, damage, or destruction occurring during such period will be adjusted by the contracting officer. (2) After passage of title to the Purchaser, and prior to the date specified for removal, the Government’s responsibility will be limited to the exercise of reasonable care for the protection of the property. (3) After the date specified for removal of the property, all risk of loss, damage, or destruction from any cause whatsoever shall be borne by the Purchaser.
* * * * *
12. Verbal ModipicatioNS. — Any oral statement by any representative of the Government, modifying or changing any conditions of this contract, is an expression of opinion only and confers no right upon the Purchaser.
(d) The invitation for bids also contained a number of provisions which were designated as “Special Sale Terms and Conditions” and which provided in part as follows:
1. Scrap is located in The Alaska Railroad Birchwood Yards. To be sold F. O. B. Cars, The Alaska Railroad, Anchorage or Seward, Alaska. All subject to export in compliance with existing Federal regulations.
2. Berthing of ship, wharfage and handling at dockside to be arranged for by purchaser.
3. Full payment of the purchase price, based on estimated tonnage to be made within fifteen (15) days from date of award. If tonnage exceeds estimate purchaser will be billed and payment must be made as scrap is delivered. If actual delivery is below estimated tonnage a refund will be made to purchaser.
4. Successful bidder must notify The Alaska Railroad at least twenty (20) days in advance of scrap being loaded on vessel to allow Railroad sufficient time to load scrap in cars. Railroad to be allowed fifteen (15) days thereafter to make delivery.
*365 7. Your attention is directed to the provisions of Paragraph 7 of the General Sale Terms and Conditions, entitled “Delivery, and Eemoval of Property.” In addition to the remedies and rights reserved to the Government in said paragraph for failure to remove the property within the specified time (which is 60 calendar days from date of award hereunder) the Government may, in its discretion, assess a demurrage charge for any cars under load. It may also, after written notice given as set forth in said Paragraph 7, declare the purchaser’s title to the property to be forfeited and revested in the Government as liquidated damages for failure to remove within the specified time.
* * * * *
9. Paragraph 15 of General Sale Terms and Conditions is nullified and the following is substituted in lieu thereof:
Disputes. — Except as otherwise specifically provided in this contract, all questions of fact involved in disputes arising under this contract shall be decided by the contracting officer, whose decision upon said facts shall be final and conclusive upon the parties subject to written appeal by the Purchaser within thirty (30) days to the head of the department or his duly authorized representative, whose decision on said facts shall be final and conclusive upon the parties hereto. In the meantime, the Purchaser shall diligently proceed with performance.
The foregoing clause is subject to the provisions of Public Law 356, 83rd Congress, approved May 11,1954; which permits judicial review of the decision of the head of any agency (or his representative or board) under the Disputes clause where it is alleged that such decision is “fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.”
4. (a) With regard to special condition 1 of the invitation for bids (see finding 3(d)), the term “f.o.b. cars” at a named city means that the goods will be delivered on board cars, without charge, to any point within the switching district which encompasses the named city that may be designated by the person receiving the goods as the desired place of delivery. However, a railroad may assess additional charges for additional work performed, over and above that involved in delivering the goods on board cars to the designated place within the pertinent switching district. For example, such *366 additional charges might cover the switching of the cars to another railroad or onto dock facilities outside the switching-district. The additional charges are dependent on the carrier’s tariffs, in connection with a movement for revenue.
('b) In an “f.o.b.” shipment, the cost of unloading the cars is always borne by the receiver of the goods and never by the railroad.
5. (a) The plaintiff was informed by the Pacific Iron & Metal Co., of Seattle, Washington, with which the plaintiff had previously dealt, regarding the prospective sale of scrap referred to in finding 3. The plaintiff was interested in the possibility of purchasing the scrap for export to Mexico and Japan.
(b) The plaintiff asked the Pacific Iron & Metal Co. to send an agent to Alaska for the purpose of inspecting the scrap, obtaining complete information regarding the prospective sale, and inquiring about arrangements for the exportation of the scrap. As a result of this request, Pacific Iron & Metal Co. sent one of its buyers, David Levinson, to Alaska. Mr. Levinson spent the period August 7-10, 1956, in Alaska on the assignment.
(c) While in Alaska during the period August 7-10,1956, Mr. Levinson (among other activities) sought to obtain information from J. W. Miles, who was mentioned in the invitation for bids (see finding 3(b)), concerning the railroad charges that would be applicable to the shipment of the scrap for export. Mr. Miles referred Mr. Levinson to the Traffic Department of the Railroad. In the Traffic Department, Mr. Levinson conferred with Edward R. Sanders, Assistant General Traffic Manager of the Railroad. Mr. Sanders advised Mr. Levinson, in response to his inquiry, that the Railroad’s Tariff 3-A would be applicable to the switching of cars and the Railroad’s Tariff 37-D would be applicable to wharfage, unloading, and service charges at the dock, and also to equipment rental if equipment owned by the Railroad were rented. Mr. Sanders furnished copies of the respective tariffs to Mr. Levinson.
(d) Mr, Sanders had not been involved in the preparation of the invitation for bids, and he had no responsibility in connection with the making of the prospective sales con *367 tract. It is inferred that Mr. 'Sanders, at the time of his conversation with Mr. Levinson, was not purporting to interpret the language of special condition 1. Indeed, the evidence fails to show that he had the invitation for bids before 'him at the time of the conversation with Mr. Lev-inson, or that he was even aware of the inclusion of special condition 1 in the invitation for bids. It appears that Mr. Sanders was interpreting the Railroad’s tariffs, rather than the invitation for bids.
(e) Information concerning the conversation between Messrs. Levinson and Sanders, mentioned in paragraph (c) of this finding, was not transmitted to the plaintiff.
(f) Mr. Levinson took a series of pictures to show the quality and condition of the material that was to be sold, and he forwarded these pictures to the plaintiff in Dallas. The plaintiff also obtained from Mr. Levinson or some other source a copy of the invitation for bids referred to in finding 3.
(g) Mr. Levinson died in 1959, several years prior to the trial of this case.
6. (a) The Railroad’s Tariff No. 3-A, referred to in finding 5(c), governed the matter of switching. It provided (among other things) for the division of the Seward Yard— which was conterminous with the Railroad’s switching district at Seward — into Zones 1 and 2, Zone 1 consisting of “All tracks located south of the north leg of the wye, within the Seward Yard limits,” and Zone 2 consisting of “All tracks north of the wye, within the Seward Yard limits.”
(b) Tariff No. 3-A prescribed a switching charge of $16.15 within Zone 1 or within Zone 2, and a switching charge of $21.72 between the two zones.
(c) Tariff No. 3-A further provided that:
A charge of $5.10 per car will be made for respotting a car on the same industry track when such respotting is done for convenience of shipper or consignee.
(d) There are two tracks in the Seward Yard where freight can be unloaded from railroad cars onto trucks; and in connection with movements for revenue of freight from other points in Alaska to Seward under arrangements whereby the freight is to be delivered f.o.b. cars, Seward, *368 the Railroad will, without additional charge,, spot the cars on either of these two tracks, as designated by the person receiving the freight.
(e) The Railroad operates in Seward a dock that is located approximately 300 yards from the Railroad’s depot in the Seward Yard, and the Railroad has a track that runs out onto the dock. The Railroad’s dock in Seward is operated as a public dock facility; and at the time involved in this litigation, the Railroad had issued its Tariff No. 37-D for the purpose of prescribing dock charges. This dock is part of the Seward Yard for operating purposes, being located geographically in Zone 1, but the Railroad has historically treated the dock as being outside the Seward Yard for tariff purposes. No written pronouncement concerning the existence of this historical practice had been made for the information of the public.
7. (a) The Railroad’s Tariff 37-D, referred to in findings 5(c) and 6(e), prescribed charges for “Handling, Loading, Unloading and Wharfage * * * on All Freight Handled Over Docks or Wharves * * * at Seward, Alaska.”
(b) The charges material to this litigation were explained in the tariff as follows:
Item No. 35. Wharfage
(a) Wharfage is the charge that is assessed on all freight passing or conveyed over, onto, or under wharves or between vessels or overside vessels when berthed at wharf. Wharfage is the charge for use of wharf and does not include charges for any other service.
(b) Freight assessed full inbound wharfage may be reshipped by water from same wharf where received without being subject to further assessment of wharfage provided the freight is not removed from wharf or premises while waiting transshipment.
Item No. 40. Handling
Handling charge is the charge made for moving freight from end of ship’s tackle on the wharf to first place of rest on the wharf, or from first place of rest on the wharf to within reach of ship’s tackle on the wharf. It includes sorting, breaking down, and stacking on wharf.
*369 Item No. 45. Loading and Unloading
Loading and unloading charges are the respective charges for the services performed in loading freight from wharf premises on or into railroad cars, or unloading freight from railroad cars, onto wharf premises. The services include ordinary sorting, breaking down, and stacking on wharf.
* * * * *
Item No. 60. Freight Handled Direct between Open Cars and Vessel
Freight handled direct between open cars spotted at ship’s side and vessel shall be subject to wharfage and loading or unloading charges, but no handling charge will be assessed.
* * * * *
Item No. 135. Service Charge
Service Charge is the charge assessed against ocean vessels, their owners, agents or operators, which load or discharge cargo at the terminals, for performing one or more of the following services: (See Exception).
1. Check cargo.
2. Receive cargo from shippers or connecting lines and give receipts therefor.
3. Deliver cargo to consignees or connecting lines and take receipts therefor.
4. Prepare dock manifests, loading lists, or tags covering cargo loaded aboard vessels.
5. Prepare over, short, and damage reports.
6. Order cars as requested or required by vessels.
7. Give information to shippers and consignees regarding cargo, sailing and arrival dates of vessels, etc.
Exception: Service charge does not include any freight handling, loading or unloading operations, nor any labor other than that which is essential to performing the service.
Charges are in cents per 2,000 lbs., or 1,000 ft. B.M.

Inbound Outbound

Freight_ *105 *85
(c) The rates prescribed in the tariff for iron and steel scrap were: Wharfage, $2 per ton; Handling, $3.80 per ton; *370 and Loading or Unloading, $3.80 per ton. It was further provided, however, that lower rates would be applicable to scrap handled by magnet from open cars, as follows: Wharf-age, $1.50 per ton; Handling, $2.25 per ton; and Loading or Unloading, $2.25 per ton.
(d) The handling of freight on the dock, and the unloading or loading of railroad cars on the dock, were performed on behalf of the Eailroad by the Northern Stevedoring & Handling Corporation under a contract between them.
8. (a) On August 21, 1956, the plaintiff submitted a bid in response to the invitation mentioned in finding 3. The plaintiff’s bid offered a unit price of $46.75 per ton and a total price of $60,775 on item No. 1, a unit price of $46.75 per ton and a total price of $70,125 on item No. 2, and a unit price of $38.35 per ton and a total price of $306,800 on item No. 3. The plaintiff’s bid on the three items amounted to a grand total of $437,700.
(b) By means of a telegram dated August 24, 1956, the plaintiff raised its unit price bid on item No. 3 to $39.76 per ton, and thus raised its total 'bid to $448,980.
(c) A bid deposit in the amount of $90,000 was made by the plaintiff.
9. (a) The bids submitted pursuant to the invitation mentioned in finding 3 were opened on August 24,1956. The plaintiff was the high bidder with a total bid of $448,980.
(b) On August 27, 1956, the plaintiff’s bid was accepted, and the plaintiff was notified by means of a telegram regarding the award of the contract to the plaintiff.
(c) J. W. Miles (see finding 3(b)) was the contracting officer for the Eailroad.
10. When contract 56-11 was entered into, the plaintiff intended to take delivery of the scrap in 'Seward. The plaintiff knew that Seward is an all-weather port, where ice would not impede the exportation of the scrap during the winter months; and the plaintiff was aware that the Eailroad operates a dock in Seward but not in Anchorage. The plaintiff understood, however, that it would have to bear the cost of unloading the scrap from the Eailroad’s cars and loading it aboard a ship or ships (see finding 4(b)).
*371 11. On August 27, 1956, the Eailroad sent to the plaintiff an invoice calling for payment of the remainder due under contract 56-11.
12. On August 30, 1956, the plaintiff informed the Eail-road in a telegram that it had chartered the steamer Fana to take the scrap steel rails under items Nos. 1 and 2 of the contract; and that this vessel could take up to 3,100 gross tons of material at Seward starting on September 17, 1956.
13. (a) In response to the invoice mentioned in finding 11, the plaintiff notified the Eailroad by means of a telegram dated September 4, 1956, that the plaintiff intended to send the balance due under the contract on September 10, 1956.
(b) The contracting officer replied in a telegram dated September 4, 1956, that payment of the amount due on September 10 would be satisfactory.
14. On September 6, 1956, the plaintiff notified the Eail-road that the latter was to accept instructions from David Levinson concerning the loading of the scrap purchased under the contract. Mr. Levinson arrived in Alaska again on September 10, and he remained there until September 20 or 21, 1956.
15. On September 10,1956, the plaintiff paid the Eailroad $358,980, representing the difference between the bid deposit and the contract price of $448,980.
16. (a) In a telegram dated September 11, 1956, and addressed to the Eailroad, the plaintiff requested that it be notified concerning the total tonnage of material that the Eailroad expected to have available under contract 56-11.
(b) The contracting officer replied in a telegram dated September 12, 1956, that the Eailroad expected to have approximately 3,500 net tons of scrap steel rails under items 1 and 2, the excess tonnage consisting of item 2 material, and approximately 8,000 tons of other scrap under item 3.
(c) The plaintiff thereupon informed the Eailroad in a telegram dated September 12, 1956, that 3,500 net tons of material under items 1 and 2 of the contract would be sufficient for the vessel Fcma, which was due at Seward about September 17, 1956. The plaintiff’s telegram also stated that information concerning the shipment of the item 3 material would be furnished in the near future.
*372 17. The scrap was prepared by the Railroad at its Birch-wood Yard, a station north of Anchorage, Alaska, and was loaded 'by the Railroad’s employees into the Railroad’s cars at that point.
18. (a) The cars containing the scrap were moved from Birchwood to Anchorage, where the scrap aboard the cars was weighed. The cars were then placed on sidings in the Anchorage area until they could be moved by the Railroad to Seward.
(b) The movement of the cars containing the scrap from the Anchorage area to Seward was controlled by the Railroad, and the determining factors were the availability of space in, and the capacity of the engines pulling, the regular trains that moved between Anchorage and Seward. The cars containing scrap were generally added to the end of the regular trains. No special trains were operated by the Railroad for the purpose of hauling the cars loaded with scrap.
(c) The scrap moved from Anchorage to Seward under company waybills, the Railroad’s dock agent in Seward being named as the consignee. No bills of lading were prepared to cover the movement of the scrap by the Railroad.
19. When the cars loaded with scrap reached Seward and the trains to which they were attached were broken up, the cars containing scrap were switched by the Railroad to any tracks within the Seward Yard that had available space where the cars could be temporarily stored pending the unloading operations at shipside. There were no tracks in the Seward Yard that did not, at some time during this movement, provide a temporary resting place for cars loaded with scrap.
20. The plaintiff made arrangements with the Northern Stevedoring & Handling Corporation for the latter to load the scrap aboard ships chartered by the plaintiff. The total amount ultimately paid by the plaintiff to the Northern Steve-doring & Handling Corporation for this service was at least $114,000.
21. The plaintiff made arrangements with the Railroad for berthing the chartered vessels at the dock in Seward operated by the Railroad.
*373 22. Loading of the vessel Fana, with scrap steel rails commenced on September 19, 1956, and continued into September 26, 1956. Mr. Levinson left Alaska almost immediately after the loading started, and the plaintiff thereafter had no representative present to supervise the loading of the Fana.
23. In connection with the loading operation, a representative of the plaintiff or (when the plaintiff had no representative at Seward) a representative of the Northern Stevedoring & Handling Corporation, by going regularly into the Seward Yard and conferring with the Railroad’s personnel, kept currently informed regarding the availability of scrap-loaded cars that could be moved to the dock in order for the scrap to be loaded aboard ship. The Railroad did not give the plaintiff or the Northern Stevedoring & Handling Corporation notice of the arrival of the scrap-loaded cars in Seward.
24. (a) A representative of the plaintiff or (when the plaintiff had no representative at Seward) a representative of the Northern Stevedoring & Handling Corporation determined the sequence in which cars loaded with scrap and temporarily stored on tracks in the Seward area were to be moved to the dock for the unloading operations. The loading procedure provided for the placement in the ship’s hold first of three or four carloads of the larger scrap that was of sufficient size to be lifted from the cars into the ship’s hold by means of a sling hooked to the ship’s tackle, and for this to be followed by the placement of a carload of the smaller scrap, which was lifted from the car into the hold by means of an electromagnet. The objective was for the smaller pieces of scrap to filter down between the larger pieces that had been loaded previously, thus utilizing the space in the hold with maximum efficiency.
(b) Instructions for the movement of cars to the dock were given informally to a representative of the Railroad, whereupon the Railroad switched the appropriate cars from the tracks on which they had been temporarily stored to the track on the Railroad’s dock. Upon reaching the dock, the cars were uncoupled from the switch engine.
*374 (c) A rubber-tracked vehicle known as a “clee track” then shunted each car to its proper position near the appropriate hatch of the ship. The “clee track” was operated by a longshoreman employed by the Northern Stevedoring & Handling Corporation.
(d) If a car was fully loaded with sling-type scrap, two longshoremen employed by the Northern Stevedoring & Handling Corporation prepared a sling-load of the material in the car for attachment of the ship’s hook. Two stevedores, also employed by the Northern Stevedoring & Handling Corporation, then attached the hook to the material, and it was lifted by the ship’s tackle from the car into the hold. There, the load was unhooked and stowed by other stevedores employed by the Northern Stevedoring & Handling Corporation. This process was repeated until the car was emptied.
(e) If a car was fully loaded with magnet-type scrap, an electromagnet attached to the ship’s tackle was used to lift the scrap from the car into the ship’s hold. The electromagnet was operated by two stevedores. When the electromagnet had removed most of the scrap and only a small amount remained in the car, the remainder was assembled by two longshoremen in such a way that it could be effectively removed by the electromagnet.
(f) Frequently, a car would contain both sling-type scrap and magnet-type scrap. In such a situation, the smaller material had generally filtered down to the bottom of the car by the time the unloading operation commenced. The sling-type material was removed in accordance with the procedure previously described in paragraph (d) of this finding; and the car, with the magnet-type material aboard, was then switched by the Railroad away from the dock to some point in the Seward Yard. Later, after several cars partially filled with magnet-type material had been similarly returned from the dock to the yard, the material from the several cars would be assembled in one of the cars by means of a crane, which the plaintiff rented from the Railroad and which was operated by a Railroad employee. The assembled carload of magnet-type scrap would thereafter be switched by the Railroad to the dock for unloading by *375 means of the electromagnet in accordance with tbe procedure previously described in paragraph (e) of this finding.
(g) The Northern Stevedoring & Handling Corporation billed the Railroad, as the consignee of the scrap at the end of the rail movement, for the services of the longshoremen mentioned in paragraphs (c), (d), and (e) of this finding, on the 'basis that such services related to the unloading of the cars; and it billed the plaintiff, as the charterer of the vessel, for the services of the stevedores mentioned in paragraphs (d) and (e), on the basis that such services related to the loading of the ship. The evidence in the record does not show the amount paid by the Railroad pursuant to the billings mentioned in this paragraph.
(h) The evidence in the record warrants the inference that two men per car would have been adequate for the performance of all the services mentioned in paragraphs (d) and (e) of this finding. However, four men were actually assigned by the Northern Stevedoring & Handling Corporation to each car under union agreements. It appears that the scrap could not have been moved out of Seward without the assignment of four workmen to each car.
(i) All the scrap, whether sling-type or magnet-type, was unloaded directly from railroad cars into the ship’s hold without coming to rest on the dock, except that the electromagnet may have dropped small pieces of scrap on the dock occasionally in the process of lifting magnet-type scrap from cars into the ship’s hold.
25. (a) The Railroad sent the following telegram to David Levinson in Seattle, Washington, on 'September 24, 1956:
MR. ANDERSON, FANA AGENT, INFORMED THIS OFFICE SERVICE CHARGE FOR SCRAP RAIL FOR ACCOUNT CHARTERER STOP CONFIRM IF SO AND IF WE MAY BILL ON YOU FOR THIS
(b) In response to a telegram requesting clarification of the message set out in paragraph (a) of this finding, the Railroad sent another telegram to Mr. Levinson on September 25, 1956, stating as follows:
REURTEL THIS DATE SERVICE CHARGE IS A CHARGE FOR SERVICES INCLUDING *376 CHECKING PREPARING MANIFESTS LOADING LISTS ORDERING CARS AS REQUESTED OR REQUIRED BY VESSELS ETC STOP DOES NOT INCLUDE ANY FREIGHT HANDLING LOADING OR UNLOADING OPERATIONS STOP RATE ON OUTBOUND FREIGHT 85 CENTS PER TON STOP MUST HAVE IMMEDIATE ACKNOWLEDGMENT AS TO WHO PAYS THIS CHARGE OTHERWISE VESSELS SAILING WILL BE DELAYED
(o) Pacific Iron & Metal Co. replied in a telegram dated September 26, 1956, stating as follows:
RETEL BILL COMMERCIAL METALS COMPANY FOR CHARGES IT IS ONE WE HAVE NEVER BEEN TOLD OF
26. In a telegram dated October 5,1956, tbe plaintiff notified the Railroad that the steamer James Liek was expected at Seward about October 16 to load the remainder of the scrap.
27. On October 16,1956, the defendant billed the plaintiff for $52,719.98, covering an additional 1,403.05 tons of steel scrap rails with angle bars under item No. 1 of the contract, Shipped on the Fana. This quantity was over and above the 1,300 tons mentioned in item No. 1. The scrap steel rails aboard the Fana went to Mexico.
28. Under the date of October 18,1956, the Railroad submitted to the plaintiff a bill in the amount of $26,005.92 for wharfage, unloading, and service charges under the Railroad’s Tariff 37-D in connection with the scrap that was loaded aboard the Fana.
29. The plaintiff chartered the vessel James Liek to lift the balance of the scrap steel rails, which had not been loaded on the Fana, plus the other scrap under item No. 3 of the contract. This vessel was loaded between October 28 and November 20, 1956, with scrap steel rails and other scrap, which went to Japan. The plaintiff sent its representative, Richard Concannon, from Dallas to Alaska in October 1956 to coordinate the loading of this vessel.
*377 30. On November 1, 1956, the Railroad sent the following telegram to the plaintiff:
TERMINAL CHARGES CMA SERVICE CHARGE AND SWITCHING SEWARD DOCK WILL TOTAL OVER FIFTY THOUSAND DOLLARS CMA CANNOT CONTINUE LOADING NOR RELEASE VESSEL UNLESS YOU AGREE BY RETURN WIRE TO PAY THESE CHARGES WITHIN THREE DAYS AFTER LOADING AND ALSO TO PAY EIGHTY FIVE CENTS PER TON SERVICE CHARGE AGAINST VESSEL FOR SCRAP LOADED FROM OTHER DEALERS.
31. In response to the bill mentioned in finding 28 and the telegram set ont in finding 30, the plaintiff on November 2, 1956, sent to the contracting officer a letter stating as follows:
We refer to your Audit Bill No. 1-1553 of October 18th which has been received by us. This bill covers charges for wharfage, handling, and so-called outbound service charges, as well as switching charges on rail delivered to the Steamship “FANA” for our account, said rail having been purchased under Bid No. 56-11 dated July 30th.
Our position with regard to these charges which total $26,005.92 is that they are not for account of Commercial Metals Company for the reason that our contract of purchase covering the rails and scrap under the above mentioned invitation clearly specified the price to be paid would be f.o.b. cars, Alaska Railroad Tracks at Anchorage or Seward, Alaska.
We elected to take delivery of the rails and are now taking delivery of the scrap at Seward, Alaska where, it is our understanding, the Alaska Railroad tracks extend to shipside.
Under the circumstances of our purchase and in view of the fact that this material was loaded onto the ship at our own expense without any handling cost accruing to the Alaska Railroad, we feel that no charges are attributable to us for the services alleged to have been rendered as evidenced by these bills.
In passing,_ it might be well to point out that the charges as evidenced by this bill are equal to approximately $8.00 per ton additional cost on the approximately 3300 gross tons of rails which were loaded on the *378 “FA“NTA”. It can be readily appreciated that if after we have paid the Alaska Railroad a higher price for their scrap material by several dollars than any other bidder, we should not be called upon to pay an additional unexpected $8.00 per ton for services which were not agreed to or made a part of the contract of purchase.
We trust that after due reconsideration in light of the above, you will see fit to cancel this bill and _we look forward to receipt of your confirmation that this action has been taken.
32. The plaintiff replied to the Railroad’s telegram of November 1, 1956 (see finding 30) by means of a telegram dated November 3,1956, stating as follows:
RETEL WE AGREE TO PAY SERVICE CHARGE ON SCRAP SUPPLIED BY OUTSIDE DEALERS STOP WE ALSO AGREE REIMBURSE YOU FOR ALL OTHER CHARGES WHICH ARE LEGALLY ASSESSABLE AGAINST US UNDER TERMS OF OUR CONTRACT OF PURCHASE UNDER INVITATION 56-11 LETTER IN MAIL TO MILES EXPLAINING OUR POSITION
33. (a) On November 5,1956, the Railroad sent the plaintiff the following telegram:
URMSG DOCK CHARGE FOR JAMES LICK .01 CENT PER NET TON FIRST 24 HOURS AND .005 CENTS PER NET TON EACH 24 HOURS THEREAFTER WILL BE BILLED COASTWISE LINE WHICH THEY AGREE TO PAY ON OTHER DEALERS FREIGHT CHARGE PAID BY THEM AND YOU HAVE AGREED TO PAY .85 PER TON SERVICE CHARGE PD WE WILL DISCONTINUE LOADING RAILROAD SCRAP UNLESS YOU AGREE BY TELEGRAM TO PAY LEGAL CHARGE PER PARA 2 SPECIAL SALES TERMS AND CONDITIONS AS FOLLOWS: WHARFAGE AT $2.00 PER TON, CAR UNLOADING $3.80 PER TON, DOCK SWITCHING $16.15 PER CAR ALL THREE ITEMS PLUS TAX, .85 PER TON VESSEL SERVICE CHARGE WITHOUT TAX, PLUS EXTRA CRANE OR OTHER SERVICES YOUR AGENT REQUESTS PD ALL ABOVE RATES ARE PUBLISHED TARIFF RATES WHICH LEGALLY THE RAILROAD MUST COLLECT EVEN IF PAID UNDER PROTEST.
*379 (b) The plaintiff replied on November 6, 1956, by a telegram stating as follows:
YOURTEL 5TH PARAGRAPH TWO SPECIAL CONDITIONS OF INVITATION 56-11 OBVIOUSLY IN CONFLICT WITH PARAGRAPH ONE AND FEEL YOUR UNILATERAL DECISION AS TO WHICH SHALL GOVERN IS UNWARRANTED STOP IN VIEW OF CLEAR CASE OF CONFLICTING TERMS OF YOUR SALE FEEL THAT AT BEST YOU ARE ENTITLED ONLY TO ASK FUNDS BE PLACED IN ESCROW PENDING DETERMINATION OF OUR LIABILITY, ADVISE
(c) The Railroad telegraphed the plaintiff on November 8, 1956, as follows:
URMSG SIXTH NO CONFLICT EXISTS BETWEEN PARAGRAPHS ONE AND TWO PD CHARGES QUOTED OURTEL FIFTH APPLICABLE MOVEMENT CARS FOB SEWARD TO SEWARD DOCK CMA UNLOADING CARS CMA VESSEL SERVICE CHARGES PD APPROVE YOUR PLACING FUNDS IN ESCROW CMA ADVISE NAME OF BANK AND MAIL ESCROW AGREEMENT SHOWING SIXTY FIVE THOUSAND DOLLARS DEPOSITED PD WE WILL FINISH LOADING WITHOUT DELAY END
,34. In order to complete the loading of the James Lick and release the vessel, the plaintiff placed $65,000 in escrow with the First National City Bank of New York. This amount was subsequently delivered to the United States Treasury by the 'bank in order to permit the bank to be dismissed as a party. Claim is made by the plaintiff for the amount so released.
35. On November 6,1956, the plaintiff made a further payment to the Railroad in the amount of $52,719.98 under contract 56-11, in response to the bill mentioned in finding 27. This 'brought the contract price to a total of $501,699.98.
36. During the loading of the ships Fana and James Lick, the defendant performed various services for the plaintiff. These included the preparation of ships’ manifests and the keeping of daily progress reports on the carloads of scrap loaded through the respective hatches, reports of cars brought on the dock, and summaries of the cars unloaded.
*380 37. When the James Lioh was fully loaded, there remained some excess scrap which could not be loaded aboard by reason of there being more scrap available under the sale than was estimated. Since this scrap was not of sufficient quantity (approximately 900 tons) to justify chartering another vessel, the plaintiff entered into a lease with the Eailroad to store the scrap north of the Seward Yard. The scrap was unloaded at the plaintiff’s expense, stored, and subsequently sold. The lease was terminated on July 31, 1957. The plaintiff paid the Eailroad for this storage. No de-murrage was ever charged by the Eailroad.
38. (a) On November 19, 1956, the plaintiff asked the contracting officer for a decision from which it could appeal to the head of the department, if it so desired.
(b) A conference concerning the plaintiff’s request mentioned in paragraph (a) of this finding was held between a number of the Eailroad’s officials, including the general manager, assistant general manager, general traffic manager, legal counsel, and J. W. Miles, the contracting officer. A consensus was reached concerning the decision that should be rendered in the case, and the task of drafting the decision was assigned to the general traffic manager. After the decision was drafted, it was signed by J. W. Miles, the contracting officer, on December 7, 1956, and dispatched to the plaintiff.
(c) The administrative decision was in the form of a letter addressed to the plaintiff, stating as follows:
Eeplying to your telegram of November 19, and in conformance with escrow agreement, you are advised that Invitation 56-11, for sale of certain Eailroad scrap, was offered on the basis that The Alaska Eailroad would deliver said scrap in cars at either of two stations, Anchorage or Seward, Alaska, and that said invitation so specified in paragraph 1, page 4, under the heading: “Special Sale Terms and Conditions.” Part 1 reads:
1. “Scrap located in The Alaska Eailroad Birchwood yards. To be sold F.O.B. Cars, The Alaska Eailroad, Anchorage or Seward, Alaska.”
You elected to use Seward rather than Anchorage and accordingly the Eailroad transported the cars to Seward *381 without charge. The contract was fulfilled on delivery of the cars on siding in the Seward yards awaiting transshipment and your company under the F.O.B. Seward provision automatically received the cars at that time and such cars became subject to the provision of the tariff governing storage and demurrage.
The Alaska Railroad owns and operates a wharf at Seward, Alaska, and maintains a bridge connection between this wharf and the Seward Railroad yards for transferring rail cars in the performance of an interchange of traffic with ocean vessels.
Paragraph 2, reading as follows, “Berthing of ship, wharfage and handling at dockside to be arranged for by the purchasers,” was included in this invitation to bidders in order to spell our requirements that the purchaser will arrange for berthing and dockside charges and therefore this paragraph clearly states the Railroad’s position in this regard. This clause would have been superfluous if the wharf to be used had been the property of another company, as the seller would have no concern in the interchange or transfer to a vessel.
Terminal charges for berthing of vessels, for all charges incident to transfer of freight between vessels and wharf or cars, service charges, crane rental charges and all other services performed on the Seward Dock are set forth in The Alaska Railroad Tariff 37-D. The terminal costs incurred in this transfer are assessable in two ways, the berthing charges, crane rental charges and service charges are for the account of the vessel, its owner’s or agent’s and the charges for wharfage and handling (in this instance, furnishing labor to unload cars, make up sling loads, jockey cars, etc.) are for the account of the cargo. Under your charter, the vessel accepted only the berthage charges for its account, with all other charges being for the account of the cargo or the charterers. Therefore, our billing to you includes all of the terminal services except dockage. Our billing also includes the proper charges for switching cars to the shipside.
Your allegation of a clear case of conflicting terms is without any substance of fact and it is my opinion the terms of the sale are clearly stated and that purchaser has failed to take cognizance of paragraph 2 and the rates and conditions published in tariffs governing the wharf facilities at Seward.
*382 Accordingly, it is determined that the following sums are due The Alaska Eailroad on the ships named:
(a) SS James Licio
Wharfage and. Unloading-$40,285. 88
Service Charges_ 8, 771.19
Equipment Rental- 8, 460. 00
Switching_ 3, 410. 07
Equipment Rental- 200. 00
Extra Labor- 31. 62
$56,158. 76
(b) SS Fana
Wharfage and Unloading_$21,385.73
Service Charges_ 3, 042. 83
Crane Rental_ 220. 00
Switching- 1,131.15
$25, 779. 71
39. (a) On December 1,1956, the Railroad sent the plaintiff corrected bills for wharfage, unloading, equipment rental, switching, and service charges incurred in connection with the Fana and the James LieJc.
(b) The charges in relation to the export of scrap on the Fana were as follows:
Wharfage — sling handled- — 3579.8 tons at $2.00 per ton_ $7,159.60
Unloading — sling handled — 3579.8 tons at $3.80 per ton_ 13, 603.24
Total Alaska Railroad charge- 20, 762.84
Federal tax — 3% (26 U.S.C. 4271)_ 622.89
Wharfage and Unloading_$21, 385. 73
Outbound service charge — 3579.8 tons at $0.85 per ton _ 3, 042. 83
Crane Rental_ 220. 00
Switching- — 86 cars at $16.15 per car_ $1, 098. 20
Federal tax — 3%_ 32.95
- 1,131.15
25, 779.71
*383 (c) The charges in relation to the export of scrap on the James Lióle were as follows:

Sling lumdlecl:

Wharfage — 4,998.2 tons at $2.00 per ton- $9, 996.40
Unloading — 4,998.2 tons at $3.80 per ton_ 18,993.16
- $28,989.56

Magnet handled:

Wharfage — 2,699.45 tons at $1.50 per ton- 4, 049.18
Unloading — 2,699.45 tons 'ait $2.25 per ton_ 6, 073. 76
- 10,122.94
Total Alaska Railroad Charges for Wharf-age and Unloading- 39,112.50
Federal Tax — 3%_ 1,173. 38
Wharfage and Unloading_ 40,285. 88
Outbound service charge 10,319.05 tons at $0.85 per ton_ 8, 771.19
Switching — 205 cars at $16.15 per car_ 3,310. 75
Federal tax — 3%_ 99.32
-3,410. 07
Equipment Rental_ 3,660. 00
Extra labor — for scrap consolidation_ 31.62
56,158.76
(d) The total charges, in summary, were as follows:
Total charges — Fana_ $25, 779.71
James Inch_ 56,158. 76
- $81,938.47
Paid to the United States_ 65,000.00
Balance_ 16,938.47
40. With respect to the charges referred to in finding 39, the plaintiff concedes that certain of the charges, totaling $3,911.62, were properly assessed against the plaintiff. The items involved in this concession are crane rental in the amount of $220 in connection with the handling of the cargo loaded on the Fama, and equipment rental in the amount of *384 $3,660 and extra labor in the amount of $31.62 in connection with the cargo loaded on the James Licit.
41. Though certain of the charges referred to in finding 39 say “wharfage and handling,” they should say “wharfage and unloading,” as these were the actual services performed and billed.
42. (a) The plaintiff appealed from the administrative decision mentioned in finding 38 to the Interior Department’s Board of Contract Appeals, as the authorized representative of the head of the department. The board held a hearing on February 27 and 28, 1958. A 301-page transcript was compiled and 21 exhibits were admitted into evidence.
(b) On August 27,1959, the Interior Department’s Board of Contract Appeals rendered a decision, which stated in part as follows:
The contentions of the appellant in arguing that the Railroad was obligated to deliver and unload the carloads of scrap on the dock at a point where their contents could be picked up by the ships’ hooks are untenable. Indeed, they represent a position that is unreasonable. A railroad by becoming a seller does not cease to be a common carrier, and it does not debar itself from collecting its charges as such, unless it has expressly done so by the terms of the contract of sale. Originally, the appellant contended that it was being charged by The Alaska Railroad for services which had not been rendered but the record now firmly negatives this contention. The record shows, moreover, that these services were not only valuable to the appellant but burdensome and expensive for the Railroad. The appellant is, indeed, in the position of insisting that the Railroad was obligated not only to deliver the carloads of scrap on the dock in Seward but also to keep switching the cars around after their arrival in the Seward yards, and even to switch them back from the dock into the yards, in order to serve the convenience of the appellant for the period of more than a month which it took to load the FANA and JAMES LICK. Of course, if the Railroad undertook any such obligation it was bound to perform it but surely convincing proof should be produced of the existence of such an onerous obligation.
*385 When attention is turned from the problem of the destination of the shipment to the charges which the Railroad could legitimately collect under the terms of the contract, even if the destination be assumed to be the dock, the flimsiness of the appellant’s case becomes readily apparent. A shipment of goods f.o.b. the point of destination, as in the present case, means merely that the seller is obligated to transport the goods free of any expense to the buyer, and this includes, of course, the payment of the freight to the point of destination. But this does not also mean that the seller is to perform any services for the buyer after the point of destination has been reached. The principal charges made by The Alaska Railroad were for “Wharfage and Unloading,” and these charges alone, which total $61,671.61, account for almost 80 percent of the appellant’s claim. The appellant was expressly required by Paragraph 2 of the Special Sale Terms and Conditions to pay the wharfage charges. Even if the provisions of Paragraph 1 of the Special Sale and Terms and Conditions would ordinarily have required that the scrap be delivered alongside the ships at the dock at Seward, as the appellant unconvincingly contends, these provisions could not be construed to exempt the appellant from the wharfage charges in view of the express provision that the appellant pay such charges. There is, of course, no such thing as a standard f.o.b. provision, and there is nothing to prevent the parties to a sale from making provisions which will rebut the ordinary presumptions from an f.o.b. shipment, for, like all the rules of the law of sales, they yield to expressions of contrary intention. As for the unloading charges, quite apart from the express provision for “handling at dockside” to be found in the Special Provisions and the provision for removal of the property at the expense of the buyer to be found in the General Provisions, even if it were to be unreasonably assumed that the contract required the scrap to be delivered on the dock, the Railroad would not have been required to unload the cars, since this would not have been a part of the delivery but a service performed after delivery. If the Railroad did not have to unload the cars, neither did it have to perform any other service after the cars had been once spotted at the dock, such as switching partially-unloaded cars off the dock and back again in order to admit of the scrap being stowed on the vessels in the manner and sequence desired by the appellant. The charges made by the Railroad for switching the cars in the yards were also proper, since *386 it must be held that delivery had been effected when the cars came to rest in the Seward yards. As for the service charges, they comprehended services of types which were not essential to the performance of the Kail-road’s obligation to transport the scrap to the point of delivery free of charge, and there is no language in the contract from which an intent that they shall be borne by the Kailroad could be inferred.
Finally, the appellant contends that it was advised by representatives of the Kailroad “who drew the contract” that “the original intention of the contract was to move the scrap right to shipside without assessing the questioned charges in order to attract buyers from the states” and that “Internal conflicts in the Kailroad accounted for the later attempts to collect the charges.” It is extremely questionable to say the least whether the evidence on which these contentions are based, which consists of the testimony of ’Concannon, was admissible, but if it may be considered at all, if is too vague and uncertain to warrant a finding that any of the officials concerned with the making or administration of the contract interpreted its provisions as meaning that the Kailroad would absorb the charges in controversy. Concannon testified (Tr., p. 48-49) that Deede told him that it was “the original intention of the contract” to make the charges that were later assessed but that he had persuaded “the managing officer of the Kailroad” not to do so, and that subsequently, after a change had occurred in management of the Kailroad, a conflict had developed between the storage and traffic departments of the Kailroad, with the result that the charges had been made. Concannon also testified that he “talked with Mr. Miles (the contracting officer) and he was in accord with Mr. Dede (sic) on the intent of this sale.” The record shows that these alleged conversations could not have taken place until after the Kailroad had imposed the charges, and they could very well be typical pieces of misunderstood gossip which were in any event meaningless, for the question is not what the Kailroad originally may have intended but what in fact it finally decided to embody in the contract. 'Sanders, who, as Assistant Traffic Manager of the Kailroad, was certainly in a position to know, was emphatic in his testimony that there had never been any conflict between the storage and traffic departments of the Kailroad. Sanders testified, moreover, that prior to the hid opening the appellant’s agent Levinson had inquired from him what tariffs would be applicable to the sale of the scrap, and that *387 be bad explained to tbe agent wbat tariffs would be applicable. There is also in evidence a deposition made by Miles, tbe contracting officer, to tbe effect tbat prior to bid opening Levinson bad inquired of him what tariffs would be applicable and that be bad referred tbe agent to tbe Traffic Branch of tbe Railroad for this information. There is, to be sure, also in evidence a letter dated October 14, 1957, in which Levinson in response to an inquiry from appellant’s counsel, stated: “ I do not recall any reference made by E. R. Saunders (sic) to Tariff 37-D prior to the actual sale of scrap to Commercial by tbe Alaska Railroad.” But this statement can hardly be regarded as a positive denial. On •the basis of tbe record the Board can only find tbat tbe appellant was informed prior to tbe bid opening tbat the sale of the scrap would be made subject to all applicable railroad tariff charges.

Oonolmion

Therefore, pursuant to tbe authority delegated to tbe Board of Contract Appeals by tbe Secretary of the Interior (sec. 24, Order No. 2509, as amended; 19 F.R. 9428), tbe findings of fact and decision of tbe contracting officer are affirmed.
43. On June 3,1964, the parties filed a stipulation stating as follows:
It is hereby stipulated by and between the parties hereto that by reason of the administrative settlement of December 5, 1962, whereunder Tbe Alaska Railroad agreed to pay plaintiff tbe sum of $3,734.44, and withdraw its second counterclaim, tbat tbe following action shall be accomplished:
(1) Paragraphs 27 through 34 of Count 2 as set forth in the second amendment to plaintiff’s petition filed November 16, 1961, shall be dismissed.
2. Defendant’s second counterclaim, as set forth in paragraphs 33 through 38 of its answer filed January 10, 1961, shall be dismissed.
This stipulation is made for the purpose of implementing the administrative settlement reached between plaintiff and The Alaska Railroad as 'finalized on December 5, 1962.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter *388 of law that the plaintiff is entitled to recover under the first count of the petition, as amended, and judgment is entered to that effect. The amount of the recovery will be determined pursuant to Eule 47 (c) (2). Count II of the petition, as amended, and the defendant’s counterclaims are dismissed.
In accordance with the opinion of the court, a memorandum report of the Commissioner, and a stipulation of the parties, it was ordered on October 10,1966, that judgment be entered for the plaintiff for $10,968.35.

The court has not considered the claim for “spotting” charges raised by the defendant before the court because that claim was not raised before or presented to the trial commissioner.

The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 The contract price was ultimately, Increased to $501,699.98 on the basis of a determination by the Railroad that it had delivered to the plaintiff 1,403.05 tons of scrap steel rails over and above the quantity estimated in the contract.

Increase.