**BREESE BURNERS, Inc.**

v.

**UNITED STATES.**

No. 50191.

United States Court of Claims.

June 8, 1954.

See also 118 F.Supp. 373.

Huston Thompson, Washington, D. C., for plaintiff.

Bernard Wohlfert, with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff sues for damages for the unauthorized use of its patents in the manufacture of oil burning tent stoves by or for the defendant in the latter part of 1950.

Defendant defends on the ground that it had the right to use these patents under a license granted it by plaintiff on or about September 11, 1943. Plaintiff replies that the unauthorized use of which it complains was after the expiration of the term of the license. Plaintiff also says there was no consideration for the license, and that it was given under duress.

In view of the relatively large number of patents and applications plaintiff alleges it owned (13 patents and 4 applications), at the suggestion of the Commissioner, in order to save time and expense, the parties agreed in the pretrial memorandum of October 30, 1952, that the basic defense of license be first determined upon full proof taken before the Commissioner, submission of findings of fact by the Commissioner, and subsequent arguments of counsel on this

issue. The parties further agreed that evidence as to any unauthorized use by or for the Government of any of the plaintiff's patents herein involved and the amount recoverable therefor be deferred until the court determines the validity and duration of the license.

Prior to September 11, 1943, defendant's army tents were heated by coal-burning stoves. It desired to adapt these stoves to oil burners so as to minimize the smoke emitted from the stoves. Accordingly, some time in August 1942 it requested plaintiff, which was a research and sales organization, to undertake this task. Plaintiff agreed and began work on the development of such an oil burner.

Some time prior to May 19, 1943, it had developed such a burner and had submitted it to the Army for testing. On that date it was notified that while the Army was on the whole pleased with the product, it thought it might be improved by certain modifications, but the letter concluded, "all members of this office are in accord on its adoption and use."

About a month later, to wit, on June 18, 1943, Colonel Doriot, of the Quartermaster General's Office, wrote plaintiff requesting a royalty-free nonexclusive license covering the patents used in the manufacture of these tent stoves. Plaintiff gave careful consideration to working out a plan whereby it could give the Government such a license and still protect itself against the day when governmental controls would be lifted and it could again do a general commercial business.[1] But nothing was done at the time.

Later, on September 3, 1943, after conferences between the parties, plaintiff was notified that it was to be awarded a contract for 74,620 of these burners and it was given a bid form, which it was instructed to fill out and return. The notice read as follows:

"Your company is to be awarded contract of 74,620 each Outfits, Burner, Oil, Stove, Tent, M–1941, at a unit price of $14.34, in accordance with Spec. JQD No. 431, dated 31 August, 1943, Stock No. 65–N–1852. Deliveries are to be as follows:

"November, 1943.. 35,000
"December, 1943.. 39,620

"Packaging to be in accordance with Spec. JQD No. 431 and in addition a separate quotation will be made by your company to cover export packaging, which will become a part of the contract.

"Contract Number is W–12–036–QM–182, O. I. 1587–4–x. Priority rating assigned is AA–1. Master Allotment is W–710–0914–3Q–4Q–43.

"You are requested to furnish this branch a list of subcontractors together with Cost Analysis of the item on this contract and the contract is to bear Re-Negotiation Clause, Article No. 33, Revision of Entire Price by Negotiation, which is a part of your bid."

Plaintiff was requested to furnish the following information among others:

"Give general description of nature of engineering and development expenses and special tools considered as applicable to this proposal and state approximate period in which they were incurred or are to be expected to be incurred. If such expenses are to be amortized under this proposal, give the estimated basis of amortization:

To this item plaintiff replied as follows:

"Engineering and development expense $45,000 incurred since Aug. 27, 1942 to date. Development of several models of complete tent heaters at Santa Fe and Chicago laboratories. Work with Research

1. On April 15, 1942, and August 5, 1942, the War Production Board had prohibited the production of oil burners for civilian use. These controls were lifted on May 11, 1945.

and Development Section O. Q. M. G. and Bureau of Standards. Collaboration with accessory manufacturers. To be amortized on this order."

The development cost item was allocated in the itemized portion of the bid at 60 cents a burner, making a total of $44,772. The bid price was $14.34 a unit, the total quantity being 74,620 units involving a total sum of $1,070,050.80. This bid form was signed by Perry, plaintiffs' Chicago representative, on September 13, 1943, and was returned to defendant a few days later.

On September 4, 1943, defendant renewed its request for a license to use the patents to be incorporated in the stoves. Its request read:

"Supplementing this Depot's letter to you of yesterday, 3 September 1943, referring to prospective award to you of contract for 74,620 each Outfits, Burner, Oil, Stove, Tent, M–1941, upon the delivery schedule and with the packaging specifications and under the prospective contract number therein indicated, you are advised that, of course, such an award cannot be made until and unless your concern enters into an agreement with the Government extending the Government a royalty-free license on each and all of your claimed patents which may be applicable to this contract item and all and any parts, features, etc., of the same.

"This is pursuant to conversations with the Office of The Quartermaster General, Washington, D. C., in which royalty-free license covering each and all of the said claimed patents was requested of you, to be applicable to manufacture by or for the Government for governmental use, sale or disposal of this item, its parts, features, etc.

"In conversation yesterday at this Depot, with Mr. N. McManamy, Procurement Specialist and Captain Edward W. Moses, Officer in Charge of Legal Section, your Mr. Perry advised that the giving of such royalty-free license to the Government was under close consideration.

"Within the next few days the form of the royalty-free license which is requested for the Government will be forwarded to you.

"It is anticipated that this office will hear from you favorably in the immediate future so that this matter may be disposed of to the mutual satisfaction of both parties."

The license not having been sent in by plaintiff, defendant wired it on September 10, 1943, as follows:

"Re Conversation Must Have Names All Partners Your Company And Patent Numbers Immediately Or Letter Of Award Will Be Withdrawn

"Jeffersonville QM Depot
"Food Equip. Pur. Br."

On the following day defendant sent plaintiff a license for its signature, which was executed and returned by plaintiff on September 17, 1943.

The part of this license relative to the term of it reads:

"Now, Therefore in consideration of the premises and the sum of One Dollar, and other good and valuable considerations the receipt and sufficiency thereof are hereby acknowledged, Licensor hereby grants to the United States of America, as represented by the Secretary of War, the irrevocable, non-exclusive, royalty free right and license under said Oil Devices burner patents and applications to make, use, and sell, or otherwise dispose of in accordance with law, and to cause to be made, used and sold, or dispose of, burner outfits substantially in conformance with specification JQD 431 hereto attached and marked Exhibit A, and all other gravity feed, pot type, low draft burner outfits suitable for tent or other space heating, baking and cooking, and any and all component parts thereof;

said right and license to extend throughout the United States, its territories and possessions, and to remain in full force and effect for the duration of the present war and the period of six months thereafter only, reserving to Licensor the unrestricted use and enjoyment of all other rights not hereby expressly granted to the United States of America."

Finally, on September 25, 1943, defendant sent plaintiff an order for 74,-620 tent stoves at $14.34 each, which was accepted by plaintiff on September 30, 1943. This order, some eleven pages long, set out in detail the contract between the parties. It was designated as contract No. W12–036QM182, Order No. 1587–4–x.

Plaintiff says, and the Commissioner has found, that defendant gave plaintiff no valuable consideration for the license. We are compelled to disagree.

Defendant first requested this license on June 18, 1943, which was 2½ months before defendant had notified plaintiff it was to be awarded a contract, and the matter had also been discussd with the manager of plaintiff's Chicago office when he went to Washington on August 23, 1943, for a conference with defendant. No mention was made of it in the bid form which defendant instructed plaintiff to fill out, but its two previous requests were reiterated on the following day and before the bid form had been filled out and returned by plaintiff and before the above-mentioned contract No. W12–036QM182, Order No. 1587–4–x, had been executed.

The fact that the demand for the license was made on the day after plaintiff had been notified that it was to be awarded a contract, is of no significance since twice before plaintiff had been notified that defendant would expect a license. Besides, the demand of September 4, 1943, was several weeks prior to the date of the formal contract, and the license was given a week or two prior to the contract. It was given in part consideration for the contract, or as an inducement for its execution.

Defendant's letter of September 3, 1943, quoted above, was not a contract, but a notice that defendant was willing to enter into a contract. The contract was later executed on September 25, 1943. This notice was given after defendant had twice before demanded a license, "in order to protect [its] interests."

█ We do not think it can be said that the license was without consideration or that it was obtained through duress.

The period during which the license was or is in effect is a more difficult question. It reads that it is "to remain in full force and effect for the duration of the present war and for six months thereafter only * * *."

Defendant says "duration of the war" has a well recognized meaning and that this meaning must be read into the contract, citing The Protector, 12 Wall. 700, at page 702, 79 U.S. 700, at page 702, 20 L.Ed. 463; Stewart v. Kahn, 11 Wall. 493, at page 507, 20 L.Ed. 176; McElrath v. United States, 102 U.S. 426, at page 438, 26 L.Ed. 189; Commercial Cable Co. v. Burleson, D.C., 255 F. 99, 104; Hamilton v. Kentucky Distilleries, 251 U.S. 146, at pages 165–166, 40 S.Ct. 106, 64 L.Ed. 194; Woods v. Cloyd W. Miller Co., 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596; Ludecke v. Watkins, 335 U. S. 160, 68 S.Ct. 1429, 92 L.Ed. 881. Defendant says its officers, in drawing the contract, used the expression in this sense. It says that it had two forms of license agreement, one reading, "for the duration of the war," and the other, "for the duration of hostilities," and that it always tried to get the first one if it could, and only accepted the second if the licensor was unwilling to grant the first.

Plaintiff, on the other hand, says it understood the phrase to mean the duration of hostilities.

Neither side communicated its understanding to the other.

■ We have no doubt plaintiff's officers understood the expression as they said they did. This is the ordinary and commonly accepted meaning of those words. The courts have held that the clauses, "duration of the present war," "duration of the war," "termination of the war," and "engaged in war," when used in contracts, do not have a definite legal meaning, but depend upon the subject matter to which the words relate, the purpose of their use, and the intent of the parties under the facts and circumstances of each case. Girdler Corp. v. Charles Eneu Johnson & Co., D. C., 95 F.Supp. 713, 715–716, affirmed per curiam, 3 Cir., 194 F.2d 533; Stinson v. New York Life Ins. Co., 83 U.S. App. D.C. 115, 167 F.2d 233, 235, 238–239; Samuels v. United Seamen's Service, Inc., 9 Cir., 165 F.2d 409, 411–412; Ehrlich v. Barbatsis Holding Co., Fla., 63 So.2d 911; Rupp Hotel Operating Co. v. Donn, 158 Fla. 541, 29 So.2d 441; Michael Truck Foundation v. Hazelcorn, 187 Misc. 954, 65 N.Y.S.2d 387; La Jolla Casa deManana v. Hopkins, 98 Cal.App. 2d 339, 219 P.2d 871; Lincoln v. Harvey, Tex.Civ.App., 191 S.W.2d 764.

It is not commonly understood that the words "duration of the war" necessarily mean until the formal treaty of peace is signed.

The treaty of peace with Japan was between 5 and 6 years after the surrender of Japan. Germany surrendered on May 7, 1945, but a formal treaty with Germany has not been signed even as yet, although, it is true, on July 1, 1952, a contract with the Federal Republic of Germany, intending to end the war status, was ratified by the United States Senate. If defendant's position is correct, the license did not expire until July 1, 1952, and may be still in effect.

Plaintiff knew that defendant wanted these oil burners to use in tents for its troops while the war was going on, so that the site of an encampment would not be betrayed by the smoke emitted from a coal burning stove. It naturally supposed that when the fighting stopped, and the enemy had formally surrendered, defendant would have no need for additional burners, and, therefore, wanted the license only for this time.

And indeed defendant did not need further burners after the surrender. It was not until after the Korean war started, waged by a different enemy, that the defendant wanted additional stoves. The order of which plaintiff complains was given in 1950, seven years after the license had been granted and five years after the surrender of Germany and Japan, and the lifting of controls on the manufacture and sale of these burners to the public. No ordinary man would have thought the license was meant to continue so long.

But defendant says that technically "the present war" mentioned in the contract had not ended when the order was given, since the treaty of peace had not been signed, and that it used the phrase, "duration of the present war", in its technical sense. Even if it did, it did not notify plaintiff it was using the words in this sense; and there is no showing that plaintiff was aware that the words were being used in this sense. Plaintiff's testimony is to the contrary.

■ Where words in a contract have an ordinary and commonly accepted meaning, they will be given this meaning unless the party who drew the document notifies the other party that the words were intended to convey a different meaning. Moran v. Prather, 23 Wall. 492, 499, 23 L.Ed. 121; Calderon v. Atlas Steamship Co., 170 U.S. 272, 280, 18 S.Ct. 588, 42 L.Ed. 1033; Hongkong & Whampoa Dock Co., Ltd., v. United States, 50 Ct.Cl. 213, 222–223; Hotpoint, Inc., v. United States, Ct.Cl., 117 F.Supp. 572; Leroux & Co., Inc., v. Merchants Distilling Corp., 7 Cir., 165 F.2d 481, 482; Samuels v. United Seamen's Service, Inc., supra; Stinson v. New York Life Ins. Co., supra; Girdler Corp. v. Charles Eneu Johnson & Co., supra; Restatement of Contracts, sec. 235; 3 Williston & Thompson, sec. 618 (Rev.Ed.1936).

■ Also, when the meaning of words in a contract is doubtful, that doubt must be resolved against the party who drew the contract. Garrison v. United States, 7 Wall. 688, 690, 19 L.Ed. 277; Moulor v. American Life Ins. Co., 111 U.S. 335, 342, 4 S.Ct. 466, 28 L.Ed. 447; Hongkong & Whampoa Dock Co., Ltd. v. United States, supra, 50 Ct.Cl. at page 223; Callahan Construction Co. v. United States, 91 Ct.Cl. 538, 611–612; Merritt v. United States, 95 Ct.Cl. 421, 428; Standard Rice Co. v. United States, 53 F.Supp. 717, 101 Ct.Cl. 85, 95, affirmed 323 U.S. 106, 65 S.Ct. 145, 89 L.Ed. 104; Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418.

■ The cases relied on by defendant all concern the construction of statutes, not contracts. They do hold that in the construction of statutes, Congress is supposed to have meant the phrase "duration of the war" to include the period between the cessation of hostilities and the execution of a formal treaty of peace, in the absence of circumstances showing a contrary intent. But the meaning of words in a statute is not always the same as the meaning of the same words in a contract. In construing a contract we must ascertain the meaning understood by both parties, the meaning on which the minds of the parties met; in construing a statute we look for the meaning in which Congress used the words. Legislative history of an act and of other acts relating to the same subject may indicate that Congress used words in a sense of which the ordinary man was wholly unaware. But when we come to construe a contract we give to words their ordinary and commonly accepted meaning, unless it is shown that both parties understood that they were used in a different sense.

■ The phrase "duration of the war" is not ordinarily understood to extend beyond the time the enemy formally surrenders. In the case of Germany, this was on May 7, 1945, and in the case of Japan, on September 2, 1945.

We are of opinion that the license plaintiff granted was intended to expire 6 months after the last of these dates.

The case is remanded to a commissioner for further proceedings not inconsistent with this opinion.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.

LARAMORE, Judge, took no part in the consideration or decision of this case.