**RUSSELL & PUGH LUMBER COMPANY**

v.

**UNITED STATES.**

No. 322-59.

United States Court of Claims.

June 7, 1961.

John I. Heise, Jr., Washington, D. C., Warren E. Miller, Washington, D. C., on the briefs, for plaintiff.

Kenneth H. Masters, Washington, D. C., with whom was Ramsey Clark, Asst. Atty. Gen., for defendant.

DURFEE, Judge.

The plaintiff and the Bureau of Land Management, Department of the Interior, entered into a contract for the sale of an estimated quantity of standing timber on designated public lands. After

the full contract price had been paid it was discovered by the contractor that there was a deficiency of about twenty percent between the number of board feet estimated in the contract and the number of board feet contained in the designated trees actually cut and removed. Administrative claim on the Department of the Interior for the amount of the shortage was properly made and has been denied.

The position of the defendant is that the contract reflects a lump-sum transaction which, by its very terms, places the risk of shortage on the purchaser. The plaintiff insists that the contract which it signed was a unit-price contract and, that having paid for each of the estimated units of timber it is entitled to a refund to the extent that the actual production fell short of the estimate. By this suit for money damages representing the alleged overcharge the plaintiff relies on its interpretation of the agreement as the correct one.

In any event, the plaintiff vigorously contends that this action cannot be appropriately disposed of on motion for summary judgment because, among other reasons, there are material issues of fact. It becomes necessary, then, to assay the factual setting of this case to determine whether the solution of this problem will require a trial before a commissioner of the court.

In furtherance of its desire to clear certain standing and fallen timber from public lands in Idaho, the Bureau of Land Management in June 1953 gave public notice of a proposed sale of a specified number of trees estimated to contain 6,715 thousand board feet of lumber. The notice which was published on several occasions in a weekly newspaper listed quantities of different species of trees and stated that the board foot volumes given were estimates and might be more or less than the actual amounts. The notice further said that a total purchase price of $68,080.25 would be considered with a minimum deposit of $4,050.00.

The day before the notice of sale first appeared in public print, the defendant's District Forester wrote to four timber operators, including the plaintiff. It informed the addressees that the trees which were the subject of the sale had been cruised by the defendant and a summary of the cruise and appraisal data, giving numbers and species of trees, volume of board feet, and price per thousand board feet, was included.

The letter enclosing the cruise summary advised that a standard form contract would be used to consummate the sale but that certain special stipulations including the following would apply to the sale:

"All trees that are to be cut are marked. They were cruised 100 per cent and are sold by tree measurement. No scaling is done by the Bureau. You pay for the advertised volume by species. No additional charge is made if you cut out more and no refund is allowed if you cut out less than the advertised volume."

A similar statement was also included in the summary of cruise and appraisal data.

The plaintiff bid orally and offered the exact total price and downpayment suggested in the public notice. The contract prepared by defendant on a standard form was sent to the plaintiff which was given thirty days to complete and return it. Section 3 of the contract pertains to the amount and price of materials and contains (a) and (b) subsections, both of which are marked with the same footnote. That footnote says, "Strike out (a) or (b), which ever is inapplicable." The defendant followed this instruction and drew ink lines through subsection (b) which provides that total price is to be determined by multiplying the total quantity of each kind of tree by its unit price. Subsection 3(a) which remains intact in the contract reads as follows:

"The total estimated amount of materials sold under this contract, and the total price, therefor, subject to modification by reappraisal are as follows: [here each variety of tree

is listed with the estimated number of board feet for each, the unit price and total price for each variety, the total estimated quantity of board feet and the total contract price.]

"The Purchaser shall be liable for the full purchase price shown above except as it may be changed by reappraisal, even though the quantity of materials actually severed, extracted, or removed or designated for taking is less than the estimated quantity set forth above."

The plaintiff complains of several physical irregularities in the contract. The first concerns Section 3. Although the defendant struck out one of the subsections, as Footnote 2 directed, the tabular listing of quantities and prices which forms a part of 3(a) was attached in such a manner that a flap of typed material conceals parts of 3(a) and the stricken 3(b). This flap is not, however, permanently affixed and it can be lifted to reveal both subsections in their entirety. We have examined the contract which is on file as Defendant's Exhibit A and we are convinced, contrary to the contention of the plaintiff, that anyone looking at the contract, be he casual reader or prospective purchaser, would lift the flap to see what, if anything, appears beneath.

If this were the only unusual feature of this particular contract we would have no hesitancy in saying that no reasonable and prudent party thereto could have understood it to be anything other than a lump-sum sale. However, subsection (b) to section 4 contains a footnote to the effect that that subsection should be stricken if subsection 3(a) is applicable. Although subsection 3(a) was clearly made applicable, to the exclusion of subsection 3(b), the defendant failed to strike out subsection 4(b), apparently through inadvertence. Section 4 covers payments, passage of title, risk of loss and reappraisals. The important provision of the (b) paragraph recites that

"[t]he total purchase price, whether more or less than the 'estimated total price,' shall equal the sum of the total quantities severed or extracted, or designated therefor, multiplied by their respective unit prices." The failure of the defendant to delete the 4(b) provision from the standard form contract has created a cloud on an otherwise clear document.

We have alluded to the public notice of sale and the informational letter addressed to plaintiff not as a means of showing what plaintiff intended or believed when it entered into the contract. As the plaintiff has pointed out, there has been no showing that the lumber company officials received those items or relied on them. Our consideration of these items is, on the other hand, for the purpose of showing what the seller, the Government, understood the terms of sale to be. The public utterances of the defendant contain numerous references to the fact that no adjustment would be made if the trees cut out at less than the estimated quantity and that the purchaser was to pay for the advertised volume. But for the erroneous inclusion of provision 4(b) this intent was clearly reflected in the formal contract. Furthermore, upon being informed of the shortage, the District Forester promptly denied any adjustment on the ground that it was a lump-sum contract and referred the plaintiff to the provisions of subsection 3(a).[1] We think that all of the competent indications lead clearly to the conclusion that the defendant intended to enter into a sale of an estimated quantity of lumber for a fixed lump-sum.

Any reader would have experienced one of three reactions after examining the contract as drawn. He could have determined that the failure to strike subsection 4(a) was clearly an oversight in view of the earlier provisions of the contract and, therefore, have disregarded it, thereby acquiescing in the meaning

[1]. The interpretation of the contract as one for a lump-sum given it by the defendant does not appear, as has been suggested by plaintiff, to have been decided on as an afterthought by higher echelons of the Department of the Interior.

placed on the whole document by the defendant. Or he could have viewed the contradiction as an irreconcilable ambiguity and requested clarification during the thirty day period allowed for signing. This reaction apparently did not take place in this case. Or finally, he could have read the terms of the instrument as one creating a unit price contract. A careful and intelligent reading of the contract, in which the 3(b) provision relating to a unit price agreement was clearly deleted, could not, in our opinion, have resulted in an understanding of the instrument, whatever its defects, as a unit price agreement.

Yet the plaintiff alleges that this is the meaning which it took from the contract furnished it by the Bureau of Land Management and we must accept as fact the allegation of what its intent was for the purposes of the present discussion. Mistake, as the word is used in contract law, is a mental attitude which when coupled with an act having legal significance, such as the execution of a contract, itself acquires legal consequences. Restatement, Contracts § 500 (1932); 5 Williston, A Treatise On The Law Of Contracts § 1535 (Revised ed. 1937). The misapprehension under which the plaintiff labored was not one caused or induced by the defendant since it should have been apparent that the failure to omit provision 4(b) was an unintentional oversight. And the apparent inconsistency did not trouble the agents of the plaintiff enough to move them to request clarification from the defendant. We are confronted, then, with an unreasonable mistake on the part of the plaintiff neither induced nor shared by the defendant and of which it had no reason to have known, since the plaintiff did not bring the matter of the erroneous inclusion of 4(b) to its attention. This, we think, is the kind of unilateral mistake which the courts and the treatise writers believe does not permit judicial relief. Restatement, Contracts § 503 (1932); 5 Williston, A Treatise On The Law of Contracts §§ 1573, 1578 (Revised ed. 1937); American Water Soften-

er Co. v. United States, 1915, 50 Ct.Cl. 209; Korrick v. Tuller, 1933, 42 Ariz. 493, 27 P.2d 529; Bowes Co. v. Inhabitants of Town of Milton, 1926, 255 Mass. 228, 151 N.E. 116; Potter v. Miller, 1926, 191 N.C. 814, 133 S.E. 193.

The issues of fact referred to by the plaintiff, such as which party was responsible for the shortage, whether the plaintiff's logging methods were sound and whether the timber cruise was accurate, are not, in our opinion, material and hence the cases relied on for the proposition that summary judgment is inappropriate for situations in which there are disputes concerning material facts are inapposite. Since we have, in effect, determined that the document in question was not susceptible of an intelligent meaning other than that intended by the defendant, the line of cases which holds that an ambiguous contract susceptible of several possible meanings must be construed against the party which drew it likewise has no applicability to the present situation. See e. g., Breese Burners, Inc. v. United States, 1954, 121 F.Supp. 530, 128 Ct.Cl. 649; Peter Kiewit Sons' Co. v. United States, 1947, 109 Ct.Cl. 390.

Without admitting the possibility that its position as to the effect of the written agreement is untenable, the plaintiff raises another point which retains its pertinency notwithstanding our decision as to what the agreement meant. It says that the discrepancy of approximately twenty percent below the estimated quantity resulted from a gross error in the defendant's estimate and that it relied on it to its detriment. As we understand the argument, it is relevant even if the agreement is taken to be one providing for a lump-sum sale. However, even if it is accepted as true that the defendant's estimate was incorrect and that the plaintiff presumed that it was at least generally accurate and, further, that there was a shortage of as much as twenty percent, this does not, as a matter of law, entitle the plaintiff to recover.

The plaintiff understands that the estimated quantities were qualified by the phrase "more or less" which has been held to cover only minor deviations. Neither the fact nor the conclusion is precisely so. Unlike the kind of contract which the plaintiff has in mind, typified by the one which created the controversy in Brawley v. United States, 1877, 96 U.S. 168, 24 L.Ed. 622, this contract does not qualify the estimate with any such term as "more or less." On the contrary, it emphasizes that it is an estimate only and it provides that the purchase price is due and payable even if the actual production falls short of the estimate. Nor is there anything to suggest that this means somewhat short or slightly short. This contract is clearly distinguishable from the contract in Rupley Bros. v. United States, 1952, 124 Ct.Cl. 59 in which the words "more or less" appearing therein were held to cover only a minor variance. The crux of that decision was the fact that the Government had violated the spirit of the agreement in failing to mark additional trees for cutting.

The unreported case of W. C. Green and S. A. Warg d/b/a G. M. W. Logging Co., Civil No. 6779, United States District Court for the District of Oregon, which involved a shortage in excess of one-third in a timber sale contract, has come to our attention. The District Court determined that the contract there in suit was a lump-sum contract. It denied recovery for the substantial shortage despite the fact that the transaction contemplated the sale of an estimated quantity, *"more or less."* The court apparently felt that where the intention is clearly that the sale price shall be payable regardless of the quantity cut, the words "more or less" are not significant. The present case presents perhaps a stronger situation than that before the Oregon District Court for rejecting the position that only a minor quantity variance is admissible. Furthermore, it appears that in the thinking of that particular District Court, a deficiency of twenty percent would not constitute a major one. And, in the instant case we think that that attitude would be correct, certainly since the petition does not suggest any deliberate misrepresentation on the part of the defendant.

We find no material issue of fact to justify referring this case to a trial commissioner and, accordingly, the defendant's motion will be granted and the petition dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE and WHITAKER, Judges, concur.

MADDEN, Judge, took no part in the consideration and decision of this case.