**GENERAL WAREHOUSE TWO, INC.**

v.

**The UNITED STATES.**

No. 268–64.

United States Court of Claims.

Oct. 13, 1967.

Nichols, J., dissented.

Warner S. Currie and Edward H. Wasson, Jr., Atlanta, Ga., for plaintiff. Warner S. Currie, Atlanta, Ga., attorney of record. Overton A. Currie, and Smith,

Swift, Currie, McGhee & Hancock, Atlanta, Ga., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

## OPINION

MARVIN JONES, Senior Judge.

Plaintiff, a Georgia corporation, sues to recover additional rental money for office space in a building constructed by plaintiff and leased to the Government. Two questions are presented: Does the Government owe the rental money; if so, in what amount?

Plaintiff was the successful bidder on an invitation to purchase land on which the Government had an option and to construct an office building to be leased to the Government. The invitation called for the lessor to provide "a minimum of 100,000 net usable square feet of office and related space in a seven-story building, with a basement." The invitation stated further:

> The *area leased* shall be the net usable space as defined in Paragraph 10 and *shall not include* any wall, *corridor*, rest room, mechanical, lobby or other similar areas not exclusively available for use by the Government for office purposes. (Emphasis supplied.)

Paragraph 10 provided:

> "Net usable square feet" as used in this proposal means clear usable space, not including walls, corridors which it is necessary to construct in order to provide access to rooms which are specified * * *.

The invitation also included drawings of typical floor plans which described a building 280 feet long and 60 feet wide. Each floor plan showed a corridor running the length of the building equidistant from the side walls. Computations accompanying the drawings indicated that the Government excluded the corridors when determining net usable space. Plaintiff used reproductions of the Government's drawings in its bid and stated that the total net usable area offered for lease was 100,000 square feet. The rentals proposed by plaintiff were $260,000 per year for an initial 10-year period and $256,000 per year for an optional 10-year renewal period. The Government accepted plaintiff's bid in January 1962.

In July 1962, the parties executed a 10-year lease agreement providing for an annual rental of $260,000, with an option available to the Government to renew for an additional 10 years, on a year-to-year basis, at $256,000 per year. Paragraph 2 of the agreement described the leased premises as a building to be constructed with "a minimum of 100,000 net usable square feet of office and related space." The covenants of the invitation, bid, and acceptance were incorporated into the agreement.

The invitation to bid contained a change order paragraph which gave the Government the right to issue change orders during construction and a provision calling for compensation to plaintiff either by a lump sum payment or by an increase in the annual rental if a record of the changes indicated increased costs to plaintiff. Before and during construction the Government issued 28 formal change orders. The more important of these were for floor ducts to facilitate the placement of electrical outlets, for which plaintiff was credited with a lump sum payment of $22,500; a change in lamp fixtures for which plaintiff received the lump sum of $16,858; and the installation of a sound system for the lump sum of $32,676.52. All compensation under the 28 change orders was through lump sum payment with no adjustment in rental rates, and none of the change orders concerned an increase or decrease in the amount of net usable space available to the Government.

In February 1962, before construction had begun, plaintiff complied with the Government's request to increase both the length and width of the building by 4 inches, resulting in an additional 792 square feet of net usable space throughout the building. *No change order was issued, and no discussion was held of compensation* to plaintiff for the change. At later dates the Government requested and received two blocks of net usable space in the basement which plaintiff had reserved to itself in its bid: 1,432 square feet and 500 square feet. Plaintiff received no lump sum payment for these three changes, but, as will be discussed subsequently, was compensated through increased rentals.

In February or March 1962, the Government first requested and then directed plaintiff to change the basic interior design of the building. The central, longitudinal corridor was largely eliminated on each floor except the basement, and a "central core" design was substituted, which grouped the elevators and utility rooms midway along the length of the floor, against a side wall, with corridor space in front of them. The change resulted in a substantial increase in the amount of net usable space available to the Government, located in the area formerly occupied by the central corridors. Just as in the change in the size of the building, no formal change order was issued, nor was there any discussion of compensation at the time the change was directed.

In June 1963, the parties amended Paragraph 2 of the lease agreement. The Government agreed to pay additional rental for the 792 square feet of net usable space it had acquired through the expanded dimensions of the building and for the 1,432 square feet and 500 square feet it had gained in the basement. The rental rate for these areas was $2.60 per square foot per year for the 10-year period of the lease, and $2.56 per square foot for the annual renewals. The dollar amounts were arrived at by dividing the number of square feet originally offered by plaintiff (100,000) into the annual rentals ($260,000 and $256,000).

This suit was brought to recover rent for other additional space made available by plaintiff to the Government: (a) the additional space the Government received by virtue of the change from the central corridor design to the central core design; and (b) certain areas in the basement and on the first, fifth, and seventh floors. Plaintiff seeks compensation at the rate the Government has agreed to pay for net usable space it is admittedly liable for.

The Government argues that it owes plaintiff nothing for the space in the former central corridor area. It points out that the invitation and the lease document signed by the parties called for plaintiff to provide a *minimum* of 100,000 square feet of space, and that plaintiff agreed to lease the space for a total annual rental of $260,000; therefore, the Government argues that it "is not liable for more than the rental specified in the lease for the space furnished even if the amount of space exceeded the minimum of 100,000 square feet of usable space." Defendant's Exceptions to Report of Commissioner and Brief, p. 15.

The Government contends that since it was the sole and exclusive tenant of the building it alone had the right to the area formerly occupied by the central corridors; that plaintiff's only access to the central corridors was to have been for cleaning and maintenance; and that therefore when the interior design of the building was altered and the Government used a portion of the former corridor space for offices, it deprived plaintiff of nothing to which monetary value could be attached.

We cannot agree with the Government's argument that the lease precludes plaintiff's right of recovery for the additional space, because we find that the lease is ambiguous with respect to this matter. We agree with the defendant, however, that any recovery by plaintiff should be limited to the amount of space

actually used by defendant and should not include the cross corridors, nor what was left of the longitudinal corridors.

The invitation to bid, which was expressly incorporated into the lease, stated that the building was to be used exclusively by the Government and that the amount of space required was "a *minimum* of 100,000 net usable square feet of office and related space." (Emphasis added.) These provisions can be read so as to support the Government's position that the use of the entire building (except certain areas in the basement) belonged to the Government, and that if the ultimate amount of net usable space in the building happened to exceed the minimum of 100,000 net usable square feet, the Government would not thereby be obligated to pay more rental than was stipulated in the lease. On the other hand, these provisions can be read consistently with plaintiff's position by interpreting them to mean only that plaintiff would rent office space to no other tenant and that each plan submitted by a bidder to the Government had to provide for at least 100,000 square feet of office space before it would be considered for acceptance.

Paragraph 8 of the General Provisions of the invitation to bid stated that "the *area leased* shall be the net usable space as defined in Paragraph 10 and shall not include any * * * corridor * *." (Emphasis added.) Paragraph 10, supra, carefully defines "net usable square feet" and expressly excludes corridors from the definition. From the painstaking description of net usable space plaintiff could reasonably deduce that the amount of net usable space leased was to be a paramount consideration in determining the rental price. And since corridors were not included in the area leased, i. e., the net usable space, it was also reasonable for plaintiff to believe that when corridor space was converted into additional office space the Government would be obligated to pay increased rentals accordingly. Yet these provisions are certainly not conclusive on the issue of increased rental, and it can reasonably

be contended that their sole purpose was to clarify to potential bidders the Government's minimum requirements for office space.

The lease is fraught with even more uncertainty than the invitation to bid. In the first place, the ambiguous invitation is expressly incorporated into the lease. Also incorporated into the lease is the actual bid of plaintiff. This bid made no reference to a "minimum" amount of space. It offered exactly 100,-000 square feet for lease at the specified rate of rental. Plaintiff argues that the bid and its incorporation into the lease indicate that the parties intended the lease of a particular amount of area for a particular sum of money and contemplated that additional area would be compensated for.

We are thus confronted with a document that is ambiguous with respect to the issue of whether plaintiff is entitled to compensation for the corridor space. See, e. g., Dipo v. Ringsby Truck Lines, 282 F.2d 126 (10th Cir. 1960); United Packinghouse Workers of America v. Maurer-Neuer, Inc., 272 F.2d 647 (10th Cir. 1959) cert. denied, 362 U.S. 904, 80 S.Ct. 611, 4 L.Ed.2d 555 (1960); Johnson v. United States, 173 Ct.Cl. 561 (1965). The provisions in question can be read to support plaintiff's argument, but they are also susceptible of an interpretation favorable to the Government; none of the provisions are specifically addressed to the issue, and none are conclusive of it.

■ It is a fundamental rule of construction that an ambiguous contract should be interpreted most strongly against the party who drafted it. E. g., Lilley-Ames Co. v. United States, 293 F.2d 630, 154 Ct.Cl. 544 (1961); Breese Burners, Inc. v. United States, 121 F. Supp. 530, 128 Ct.Cl. 649 (1954); Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947). If the contract is reasonably susceptible of two differing interpretations, that interpretation placed on the contract by the nondrafting party will prevail. E. g., Thompson Ramo Wooldridge, Inc. v. United States,

361 F.2d 222, 175 Ct.Cl. 527 (1966); Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 171 Ct.Cl. 478 (1965); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963). In the instant case the Government authored the ambiguous provisions. Thus when the rule is applied to the case at bar, it becomes clear that plaintiff's interpretation should be given effect and that plaintiff is entitled to additional compensation for the additional net usable space it made available to the Government.

■ It is well settled that the conduct of the parties to a contract is of great weight in interpreting the contract, e. g., Universal Match Corp. v. United States, 161 Ct.Cl. 418 (1963); Union Paving Co. v. United States, 115 F.Supp. 179, 126 Ct.Cl. 478 (1953); Houston Ready-Cut House Co. v. United States, 96 F.Supp. 629, 119 Ct.Cl. 120 (1951), and the conduct of the parties in this case with respect to the areas of additional space requested by the Government lends support to the conclusion we have reached.

In February 1962, after the lease had already been signed, the Government asked for a 4-inch expansion in the dimensions of the building. In February or March, the Government requested the change from central-corridor to central-core design. In neither instance was extra compensation discussed at the time of the request. Plaintiff made the changes expecting to be paid for the extra space the Government would derive, and all the circumstances indicated that this belief was a reasonable one. Later the Government requested and received extra space in the basement that plaintiff had reserved to itself. The Government, in Amendment No. 2 to the lease agree-, ment, agreed to compensate plaintiff for all areas of increased space except that formerly occupied by the central-corridor area. The rate of compensation for the extra space was based on the amount plaintiff charged in its bid for the 100,-000 square feet originally offered. If the Government had intended to pay nothing for the space it received in excess of 100,000 square feet, if the use of the word "minimum" and the provision giving the Government exclusive occupancy obviated any obligation to pay, then there appears to be no reason for the Government to have agreed to pay plaintiff as specified in the amendment. On the contrary, the conduct of the parties in agreeing to extra compensation for the areas requested after the lease had already been signed indicates that plaintiff expected to receive and the Government expected to pay additional rental when the net usable space was increased.

Apparently the reason the Government agreed to increase the rental payment was not simply to compensate plaintiff for the cost of providing the space, for the rate of payment was not based on the cost to plaintiff but on the amount of additional space provided. The record shows clearly that where a change involved merely increased construction costs the parties elected to settle through lump sum payment, but where a change involved the transfer of space the parties elected to settle through increased rentals. The Government evidently recognized an obligation under the contract to pay the agreed rate for the extra space. We think the contract obligated the Government to pay additional rental for *all* of the net usable space it received over the 100,000 square feet originally offered by plaintiff, not just for those areas for which the Government might elect to pay.

We turn now to a consideration of how much additional square footage is involved and the proper rate of compensation for it.

■ With respect to the increased net usable space which resulted from the change from central-corridor to central-core design, the Government agrees that it is occupying 4,727 square feet which otherwise would have been enclosed within central corridors. Plaintiff claims an additional 3,700 square feet, or a total of 8,427 square feet. This space is composed of a number of what plaintiff calls inter-office pathways, each containing 100 square feet, located on all floors except the basement. The Government ar-

gues that they are corridors and therefore excludable from net usable space under the definition agreed to by the parties. We agree with the Government. Our examination of the record, most particularly defendant's exhibit 8, convinces us that, regardless of the small size of these several areas, their primary function was to provide access from offices to larger corridors. They are located between partitioned offices and in most cases the doors of the offices open onto them. They would appear to fit the common meaning of the word "corridor:"

1. a gallery or passage connecting parts of a building;

2. a passage into which several rooms or apartments open (The Random House Dictionary of the English Language, Unabridged Ed. (1966).)

There is nothing to indicate that we should apply other than this standard meaning. This court recently held, in Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 173 Ct.Cl. 374 (1965), that trade usage takes precedence over ordinary meaning, but here there has been no showing that the meaning of "corridor" in the construction or real estate business is different from that in everyday usage. We find, therefore, that these areas, comprising 3,700 square feet throughout the building, are not part of the net usable space and are excludable from plaintiff's recovery.

With respect to the other areas in dispute we find as follows:

■ *Basement.* A telephone equipment room of defendant is properly included in net usable space. There is apparently a conflict of testimony on the size of the room, and the figure of 400 square feet is adopted. A storage area used by plaintiff is excluded. A comparison of plaintiff's exhibit 28 with defendant's exhibit 8 indicates that the computation of net usable space should include 500 square feet specifically transferred to the Government in the amendment to Paragraph 2 of the lease agreement.

Details concerning other areas on the first, fifth, and seventh floors are contained in the numbered findings.

■ With regard to the rate of compensation which the Government is required to pay, we find that it is logical and proper to apply the rates agreed to by the parties of $2.60 per square foot per year for the initial 10-year period of the agreement, and $2.56 per square foot for the annual renewals.

NICHOLS, Judge (dissenting):

I respectfully dissent from the opinion of the majority.

My examination of the documents in question does not reveal any ambiguity in the provisions relating to the "net usable square feet" to be leased and paid for by the Government, nor do they call for payment by the Government for the extra usable space occasioned by the change from a "central corridor" to a "central core" design. I agree with the Government's contention that it is not bound to pay for any of this extra space. I cannot ascribe to the documents an "intelligent meaning" other than that which the Government proposes and, therefore, though the documents are said to be ambiguous, " * * * the line of cases which holds that an ambiguous contract susceptible of several possible meanings must be construed against the party which drew it * * * has no applicability to the present situation." Keco Industries, Inc. v. United States, 364 F.2d 838, 843, 176 Ct.Cl. 983, 991 (1966), cert. denied 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967), quoting with approval Russell & Pugh Lumber Co. v. United States, 290 F.2d 938, 941, 154 Ct.Cl. 122, 128 (1961).

If plaintiff expected additional rental in the event that some corridor space was converted to "net usable space," it expected a windfall, because such conversion was in no way a detriment and added nothing to its burdens. There would be no rational reason why the Government would contract for this outcome. In determining whether a contract is ambiguous because of having more than one

possible meaning, it appears to me to be proper to exclude interpretations which produce whimsical and capricious results, having no relation to the purpose of the contract. *Bishop Engineering Co. v. United States*, 180 Ct.Cl. ——; *Gelco Builders & Burjay Construction Corp. v. United States*, 369 F.2d 992, 177 Ct.Cl. 1025 (1966).

The Invitation to Bid made *mandatory*, as the inside dimensions for all seven floors and the basement, measurements of 60′ x 280′. Therefore, exclusive of the lobby and mechanical rooms which jutted from the building proper (and which, in any event, were to be excluded from the area leased), the maximum square footage available would have been 134,400 square feet. From this total was to be subtracted any " * * * areas not exclusively available for use by the Government for office purposes," e. g., walls, stairways, janitor and other closet rooms, corridors which it was necessary to construct in order to provide access to specified rooms, etc. And, as long as the remaining square footage was enough to provide "a minimum of 100,000 net usable square feet of office and related space * * *" the Government agreed to lease the premises from the successful bidder. The Government clearly intended to pay rent for a building as a whole and not in accordance with its actual "net usable square feet", as long as the latter was at least 100,000. That it meant to pay for the "whole" is borne out by the fact that the Invitation also specified that the building was to " * * * be used *exclusively* by the United States Government, its successors or assigns." (Emphasis supplied.)

Except for the owner's retention of part of the basement, which the original lease allowed, it thus must have been clear that no one but the Government was to use beneficially any of the space, "net usable" or not, and the rental was to be the same whatever it turned out to be. The sole purpose of the definition of "net usable space" was to clarify the requirement that the bidder must furnish at least 100,000 feet of such space. There was no stated purpose to measure the actual "net usable space" and mulct the Government with any excess over 100,-000. The corridors etc., excluded from the "net usable space" were no benefit to the contractor, as it had to police them, without deriving income from them, and the sole use of the corridors was for access to and among the Government offices.

Since plaintiff merely reproduced the drawings which the Government had attached to the Invitation (with one modification not important to this discussion) it knew that the rentable square footage that would result from following those plans would be not 100,000 but at least 100,*893*. At no time did the plaintiff inquire as to whether there would be an increase in rental if the "net usable square feet" exceeded 100,000. If, as I do not agree, there was ambiguity, it was the kind about which plaintiff had a duty to inquire. *Bishop Engineering,* supra. And, the Invitation provided that "Any explanation desired by bidders regarding the meaning of interpretation of the conditions and specifications of this Invitation must be requested in writing, and with sufficient time allowed for a reply to reach them before the submission of their bids." Therefore, in light of what I deem the only intelligent meaning of this contract and in light of the "Change Orders" provision of the Invitation [1] next discussed, plaintiff must have known that it would be leasing to the Government, if successful in its bid, an entire building, for a single gross rental, as long as it provided a minimum of 100,000 "net usable square feet."

The "Change Orders" provision of the Invitation gave the Government "the right to issue change orders pertaining to the *construction* after approval of the plans and specifications, and prior to completion of construction * * *."

---

1. General Provision #11 of the Invitation provided that the provisions of the Invitation, its component schedules (if any) and the provisions of the Bid Form were to be incorporated into the final lease as binding conditions thereof.

If the plaintiff's construction costs were, as a whole, increased by any construction changes called for, the Government had the option of making either a lump sum settlement or an increase in the rental rate. Thus, after plaintiff complied with the Government's request to increase the dimensions of the building 4 inches both in length and width, this change was provided for by an amendment to the lease which increased the annual rental. So too with plaintiff's surrender of the basement. In both cases plaintiff gave up something of value. However, the construction change from "central corridor" to "central core" design did not give rise to an increase in plaintiff's construction costs. In fact, as part of the debits and credits entering into the computation of the lump sum paid to plaintiff on change orders, the parties allowed *defendant* $56,720 on account of installation by plaintiff of a lesser quantity of interior movable partitions under the revised "central core" design than would have been required under the original "central corridor" design. Without there being a construction cost increase occasioned by a change order, such increase causing a final additional sum to be owed to plaintiff, plaintiff was not entitled to either a rental increase or a lump sum adjustment. In my opinion, the "corridor" to "core" change falls within the latter class. The handling by the parties of the building enlargement and the basement does not reflect an interpretation of the contract enlarging the scope of the Change Order clause from its plain words. (Emphasis supplied.)

For the two reasons stated above, those relating to the area the Government contracted to lease and to when an adjustment was to be made under the "Change Orders" provision, I must dissent from the majority opinion.