Charles A. MULLAN and Thomas F. Mullan, Jr.

v.

The UNITED STATES.

No. 108–64.

United States Court of Claims.
July 16, 1969.

Francis B. Burch, Baltimore, Md., attorney of record, and George W. Baker, Baltimore, Md., for plaintiffs. Allen, Burch & Baker, Baltimore, Md., of counsel.

Herbert Pittle, Washington, D. C., with whom was Acting Asst. Atty. Gen. Glen E. Taylor, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION *

COLLINS, Judge.

The central issue in this case is the proper construction to be given a cancellation provision in a lease agreement between plaintiffs' predecessor in interest [1] and the Government. In October 1951 the 420 Fallsway Corporation leased part of an office property known as the Hillen Building to the General Services Administration (GSA). The contract provided for Government occupancy for a

---

* The opinion written by Commissioner C. Murray Bernhardt has been helpful to the court, although we reach a different result. The commissioner's findings of fact, with additions and modifications, have been adopted.

1. Messrs. Mullan were substituted as plaintiffs for the 420 Fallsway Corporation on January 10, 1969. When, consequent to eminent domain proceedings against its property, the corporation underwent liquidation, all its assets and claims were transferred to its only shareholders, the Mullans. The corporation however, was the party concerned in all actions and at all times pertinent to the present claim. See finding No. 1.

term of years, renewable for a limited number of 3-year increments at defendant's option. The lease was amended from time to time in several respects, most of which are not pertinent here. By February 1961, the Government, through lease amendments, was renting the entire building. The successive lease renewals apparently incorporated all prior amendments.

During the lease terms from 1951 to 1955 and 1955 to 1958, the Hillen Building was occupied by the Air Research and Development Command, a branch of the Air Force. Because office space had become available elsewhere, however, the Government notified the 420 Fallsway Corporation in early 1958 that the lease would not be renewed for the term beginning July 1, 1958. In May 1958 the Social Security Administration (SSA) requested GSA to obtain office space in Baltimore for some of SSA's personnel, pending completion in that city of a new SSA building then under construction. After preliminary negotiations, GSA sent the corporation a letter of intent dated June 3, 1958. The pertinent portions of the letter are as follows:

The agency would like to extend the present lease for a three year term beginning July 1, 1958, with certain changes as follows:

(1) The lease to be firm from July 1, 1958 through December 31, 1959, cancellable thereafter on ninety (90) days notice in the event the Social Security Administration Building in Baltimore is completed;

The corporation agreed to the terms of the letter on June 5, 1958.

On June 19, 1958, a supplemental agreement drafted by GSA was executed by the parties. The agreement provided for renewal of the lease between the parties for a 3-year period. The crucial portion of that amendment states:

1. The Lessor waives notice of renewal as required by Paragraph 5 of the lease and the lease is hereby renewed for a term of 3 years beginning July 1, 1958, and ending June 30, 1961.

2. Paragraph 3 of the lease is amended by the insertion of an additional sentence recited as follows:

"The Government shall have the right to cancel this lease at anytime after December 31, 1959 upon ninety (90) days notice in writing to the Lessor, such notice to be computed starting with the day after the date of mailing. This cancellation right is exercisable only in the event that the New Social Security Administration Building, now under construction near Baltimore, Maryland, is completed and ready for occupancy coincident with the cancellation."

The new SSA building was completed and occupied by the agency in January 1960. But previously, in the fall of 1958, it was discovered that, contrary to expectations, the new building would not satisfy all SSA's space requirements. The decision was made to continue to use the Hillen Building as office space for the part of the SSA staff then located there. Construction of an annex to the new building, designed to accommodate this unexpected staff overflow, was started in 1960. On February 27, 1961, the GSA exercised its renewal option by notifying the corporation that it wished to extend the lease for 3 years beyond June 30, 1961, on the same terms and conditions as in the original lease, as amended. No specific reference was made to the cancellation provision. As the annex approached readiness for occupancy, the GSA notified the corporation on May 29, 1962, that it was terminating the lease, and defendant vacated the premises on August 31, 1962. Rent was paid through August, but not beyond.

Before our trial commissioner, defendant predicated its right to terminate

the lease in 1962 on two grounds. The Government contended that the "New Social Security Administration Building" referred to in the cancellation provision was, or included, the annex. The commissioner found, however, that the construction of an annex was not proposed until some 4 months after the execution of the June 1958 supplemental agreement. We think the commissioner's conclusion that the annex was not in the contemplation of the parties in June 1958 is compelled by the evidence. Defendant does not challenge this finding here, and we treat this argument as abandoned.

The Government still argues, however, that the cancellation provision allowed termination by the lessee upon 90 days' notice *at any time* after the completion of the new Social Security Administration building referred to therein. This termination provision, defendant asserts, was carried over into the lease as renewed for the years 1961 through 1964. GSA was therefore within its rights in canceling in 1962.

■ Plaintiffs claim that the lease renewal in 1961 bound the GSA for a full 3-year term and could not be terminated on 90 days' notice after January 1960. Plaintiffs' theory is that the clause contained in the supplemental agreement, granting the GSA the right to cancel the lease in the event the new Social Security Administration building was completed "coincident with the cancellation," gave a limited right of cancellation, exercisable only *at the time* of the completion of this building. When the GSA failed to exercise this option in January 1960, the point in time when the building was in fact completed and ready for occupancy, the option expired, and the entire clause became a nullity. Therefore, plaintiffs argue, when GSA renewed the lease in 1961, the entire termination provision, including the 90-day termination clause, was of no legal effect, and GSA was bound for the full term called for by the renewal.

■ Because the language in dispute is ambiguous, we have examined parol evidence in the record to determine from the intent of the parties what meaning they placed upon the unclear wording of the cancellation provision. *E.g.*, General Warehouse Two, Inc. v. United States, 389 F.2d 1016, 181 Ct.Cl. 180 (1967); *see* Miami Metropolitan Bldg. Corp. v. United States, 180 Ct.Cl. 503, 508–509 (1967). We find no intention that GSA was to have an unlimited right to terminate the lease, but find rather the existence of an understanding that the Government would exercise its right to cancel only at the time of completion of the new SSA building.

■ In the first place, we believe the language of the cancellation provision supports plaintiffs' reading more readily than defendant's. At the very least, since the Government drafted the ambiguous provision in issue, plaintiffs' interpretation of the clause—which we find entirely reasonable—must prevail. *E.g.*, Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398 (1968); Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 183 Ct.Cl. 358 (1968).

■ The two sentences of the termination clause should be read together, as the reference words, "This cancellation right," in the second sentence and the ordinary rules of contract construction indicate. *See* Wertheimer Constr. Co. v. United States, 406 F.2d 1071, 186 Ct.Cl. 836 (1969); Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968). The conclusion is inescapable, we believe, that the second sentence is so worded as to be a limitation upon the general power of termination given in the first sentence.

■ There is no longer any question concerning what building the parties had in mind. Nor does there appear to be any dispute that the completed construction of the building was in some way conditionally related to the exercise

of the cancellation right. What is still at issue is the nature of that relationship, which hinges upon the word "coincident." Neither party has introduced evidence to show that the meaning of this term is governed by trade usage or a specialized context, and accordingly the common and ordinary denotation of the word is to be used. *General Warehouse Two, Inc. v. United States*, 389 F.2d 1016, 181 Ct.Cl. 180 (1967). This is usually given as "occurring or operating at the same time." Webster's Third New International Dictionary 441 (1965).

Under the facts of this case, the completion of the building and the cancellation over 2 years thereafter can hardly be considered "coincident." The phrase "ready for occupancy," which denotes a state of preparedness, rather than of accomplishment, further supports the conclusion that termination was to occur, if at all, at the time of the building's completion.

For all these reasons, we accept plaintiffs' interpretation of the disputed language as more convincing. In any case, their reading is entirely plausible, and the above-mentioned rule of contract construction compels an interpretation of the clause to favor the non-drafter.

Moreover, the greater weight of the external evidence shows that in June 1958 the parties understood that the SSA employees in the Hillen Building would be moved into the new structure *at its completion,* and the lessee's power of termination was incorporated with this in mind. Much has been made of the difference between the wording of the termination power in the Government-drafted letter of intent and in the supplemental agreement. However, the language in the letter stating that the power could be exercised "in the event" of the completion of the new building is, it seems to us, at least as ambiguous as the contract wording and is susceptible to the same interpretations now urged by the parties with respect to the agree-

ment. We find the letter unhelpful and do not rely upon it.

From the parol evidence concerning the motivations and intent of the 420 Fallsway Corporation, it is unlikely that the organization intended to give the Government carte blanche with respect to termination. When the first renewal of the lease in 1955 was under negotiation, the corporation on two occasions specifically and emphatically rejected the Government's expressed request for a general power of cancellation. Although it appears that in 1958 the corporation was desirous of retaining defendant as lessee and accordingly made the concession it did regarding termination, it is improbable from its former conduct that the corporation would have allowed the Government a general power to cancel, should defendant not choose to move its employees into the new SSA building.

It is unlikely, however, that the parties seriously considered that the power of cancellation would not be exercised upon completion of the new structure. At the time of the 1958 negotiations, defendant believed that space would be available in the new building for all SSA employees, those in the Hillen complex included. As shown by defendant's exhibit No. 126, an internal memorandum, the suggestion that some employees be left in downtown Baltimore due to inadequate space in the SSA building was formulated in the fall of 1958. As the evidence indicates, for obvious financial and administrative reasons defendant hoped to consolidate all SSA functions in one building. Indeed, this was the motivation behind the later construction of the annex and defendant's purported termination of the instant lease in 1962, shortly after the completion of the annex. The other SSA employees were moved into the new building immediately upon its completion and readiness for occupancy consonant with defendant's plan of unification. From these facts, the conclusion is inescapable that, but

for inadequate space, the Hillen Building employees would also have been moved in January 1960. The logical inference to be drawn is that defendant negotiated and drafted the cancellation provision with this purpose in mind. We find, therefore, that defendant definitely intended to cancel its lease with the corporation as soon as the new building was ready for occupancy. We hold that the parties intended that the cancellation provision would be operative immediately upon completion of the SSA building or within a reasonable time thereafter consistent with defendant's purpose as discussed above.

When the Government's aim was temporarily frustrated, it chose not to exercise its limited option to cancel. The point of concurrence of time and events at which the parties expressly intended the termination power to be operable, and upon which coincidence the right was conditioned, ceased to exist. Accordingly, since the condition could never again be met, the provision no longer had legal effect. Even if the cancellation provision was incorporated in the lease as renewed in 1961, it was inoperable.

For the above reasons, we conclude that defendant wrongfully terminated its lease with plaintiffs' corporation in 1962, and plaintiffs are entitled to recover the rental payments from September 1, 1962, through June 30, 1964, plus expenses. In accordance with the commissioner's unchallenged findings concerning damages, judgment is entered for plaintiffs in the sum of three hundred thirty-two thousand eight hundred forty-one dollars and fifty-five cents ($332,841.55).

COWEN, Chief Judge (dissenting):

On the basis of his findings of fact, the trial commissioner concluded that

* * * Adverting, the plaintiff's contention would in effect impose an unrealistic and unintended limitation on the defendant's right to cancel by confining its exercise to the single day when the Operations and Administration buildings were officially completed. The plaintiff thus urges a strained construction of the word "coincident", whereas in the context used and in the absence of compelling proof to the contrary we must assume that the parties intended the logical and natural interpretation that as soon as the new quarters were ready for occupancy by SSA there would be no further need for plaintiff's premises unless some other Government requirement developed. We read the disputed term in its most natural sense to mean that the defendant could cancel the lease only if the new buildings were ready for occupancy, and at no time before but at any time thereafter. It is noted in passing that this interpretation is consistent with the letter of intent which preceded the June 19, 1958 supplemental agreement, but the letter of intent is not indispensable to the result.

I would adopt his opinion and add the following reasons for denying plaintiffs' right to recover in this case:

On February 27, 1961, when the Government renewed the lease, it exercised its right to extend the period of the lease on the same terms and conditions of the original lease *as amended.* It is axiomatic that, in the absence of an agreement to the contrary, the exercise of a convenant to renew imports a holding for the additional period on the same terms, conditions and covenants as those contained in the original lease. 51C C.J.S. Landlord & Tenant § 71.

The court agrees that the phrase "coincident with the cancellation" in the second sentence of the termination provision raises an ambiguity which authorizes the use of parol evidence to determine the intent of the parties. To hold otherwise would be to say that the Government had the right to terminate the lease only on one single day during its term and, further, that it would have

had to anticipate exactly 90 days prior to the completion of the Social Security Building, that the building would be completed and ready for occupancy 90 days thereafter and then give 90 days' notice and move out on the 90th day. Obviously, such a construction of the language would be ridiculous.

There is no explanation in the record for the variation between the provisions of the letter of intent of June 3, 1958, and the supplemental agreement of June 19, 1958. All we know is that the letter of intent was routed through the normal course for preparation, review, and approval in the GSA Regional Office and that the supplemental agreement was prepared by some representative of the Government. There is nothing in the record to indicate that there were any negotiations or communications between the parties from the date the letter of intent was signed until the date the supplemental agreement was executed. Under these circumstances, it seems to me that we must consider the provisions of the letter of intent in connection with those of the supplemental agreement to determine the intent of the parties. It is to be noted that the letter of intent in paragraph (1) thereof stated:

> The lease to be firm from July 1, 1958 through December 31, 1959, cancellable thereafter on ninety (90) days notice *in the event* the Social Security Administration Building in Baltimore is completed; [Emphasis added].

The ordinary and natural meaning of "in the event" is "if" rather than "when".

The disputed paragraph of the supplemental agreement read as follows:

> "The Government shall have the right to cancel this lease *at anytime after December 31, 1959* upon ninety (90) days notice in writing to the Lessor, such notice to be computed starting with the day after the date of mailing. This cancellation right is exercisable *only in the event* that the New Social Security Administration

Building, now under construction near Baltimore, Maryland, is completed and ready for occupancy coincident with the cancellation." [Emphasis added.]

Although the first sentence granted to the Government the right to cancel the lease at any time after December 31, 1959, the court construes the second sentence as a limitation upon the cancellation provision and holds that the right to terminate was exercisable only at the time of the completion of the building. The court avoids an untenable construction of the cancellation provision by declaring that "coincident with the cancellation" means within a reasonable time after the new building was ready for occupancy. In my view, however, this interpretation of the provisions of the contract is contrary to decisions of the courts which have considered similar termination and cancellation provisions of lease contracts. Cates v. McNeil, 169 Cal. 697, 147 P. 944 (1915); Lyons v. Cantor, 363 Pa. 413, 70 A.2d 285 (1950); Brennan v. Shore Bros., Inc., 380 Pa. 283, 110 A.2d 401 (1955), and Associated Cotton Shops, Inc. v. Evergreen Park Shop. Pl., of Delaware Inc., 27 Ill.App.2d 467, 170 N.E.2d 35 (1960).

It seems obvious to me that the words "only in the event" in the cancellation clause are not used to denote time but refer to the happening of a contingency and that the phrase means "if" and not "when". The phrase "coincident with the cancellation" is ambiguous, and in light of the first sentence of paragraph 3 of the cancellation provision and the clear import of the words "only in the event" in the second sentence, cannot reasonably be construed to delimit timewise the Government's cancellation right.

The parties have not cited any case in which a court has construed a lease cancellation provision that bears any similarity to the agreement before us. However, in my opinion, the decision of the Supreme Court of Pennsylvania in Brennan v. Shore Bros., Inc., *supra,* is so analogous that I would hold it to be de-

cisive of the issue here. In that case, the parties had entered into a lease for a term of two years. Before it expired, they negotiated a new lease for a term of three years, beginning June 25, 1950. Paragraph 2 of the new lease provided:

"The Lessee shall have the option to renew this lease, upon the same terms and conditions as herein set forth, for the further period of Two Years from June 25, 1953, by giving to the Lessors 90 days' notice in writing prior to that date. However, the Lessors shall have the option to terminate this lease *at any time within the term* or the aforesaid extension thereof, upon the death of any one or more of the Lessors, in which case such termination shall be signified by a joint notice in writing from the surviving Lessor or Lessors and the personal representatives or heirs of the deceased Lessor or Lessors, given 90 days prior to such required termination." [Emphasis added.]

On February 25, 1951, one of the lessors died but no notice of termination was given at that time by the lessors. On February 6, 1953, more that 90 days prior to the termination of the lease, the lessee exercised its option to extend the lease for a further period of two years. On February 24, 1953, the surviving lessors exercised their option to terminate the lease and gave the required notice. In the litigation that followed, the lessee argued that the lease had not been terminated in accordance with its terms, because the notice to terminate was not given at the time required. The lessee contended that the words "at any time" must be construed to mean *within a reasonable time after the death of one or more of the lessors.*

In rejecting this contention, the Supreme Court of Pennsylvania held:

It is our opinion that paragraph 2 of the lease means that the lessors, if any one of them dies within the term (or extension) of the lease, have a paramount option to terminate the lease *"at any time within the term"* (or extension), provided they and the personal representatives of the deceased lessor give to lessee a written 90-day termination notice. 110 A.2d at 404.

The court then quoted with approval the following statement from Lyons v. Cantor, *supra:*

" * * * So here, 'upon any sale of the real estate' means, not when, but if any such sale occurs, that being the condition upon which alone the lessor was to have the right to terminate the lease; there is nothing in the use of the word 'upon' which suggests that the phrase 'upon any sale of the real estate' was intended to relate back grammatically to the designation of the period during which the lease might be terminated." 110 A.2d at 404.

Finally, the court held:

Lessee's interpretation that the words *"at any time"* mean "at any *reasonable* time after the death of a lessor" requires the insertion of a word which is not in the lease and *which changes its clear language* and, in our judgment, its meaning. It follows that lessee's interpretation cannot be adopted even though the equities might be in the lessee's favor. 110 A.2d at 404.

Applying the reasoning of the court in that case, I would hold that when the Government renewed the lease on February 27, 1961, the cancellation provisions became a part of the extended lease, that the right to terminate the lease was properly exercised, and that plaintiffs' petition should be dismissed.

SKELTON, J., joins in the foregoing dissenting opinion.